## KAUKAUNA WATER POWER COMPANY *v.* GREEN BAY AND MISSISSIPPI CANAL COMPANY.

ERROR TO THE CIRCUIT COURT·OF OUTAGAMIE COUNTY, WISCONSIN.

No. 65. Argued October 30, November 2, 1891. — Decided December 21, 1891.

If the adjudication of a Federal question is necessarily involved in the disposition of a case by a state court, it is not necessary that it should appear affirmatively in the record, or in the opinion of that court, that such a question was raised and decided.

Proceedings under a state statute enacted before the adoption of the Fourteenth Amendment which, if taken before its adoption, would not have violated the constitution, may, when taken after its adoption, violate it, if prohibited by that amendment.

In Wisconsin the ownership of riparian proprietors extends to the centre or thread of the stream, subject, if such stream be navigable, to the right of the public to its use as a public highway for the passage of vessels; and the law, so settled by the highest court of the State, is controlling in this court as a rule of property.

A state legislature may authorize the taking of land upon or riparian rights in a navigable stream for the purpose of improving its navigation, and if a surplus of water is created, incident to the improvement, it may be leased to private parties under authority of the State, or retained within control of the State; but so far as land is taken for the purpose of the improvement, either for the dam itself or the embankments, or for the overflow, or so far as water is diverted from its natural course, or from

the uses to which the riparian owner would otherwise be entitled to devote it, such owner is entitled to compensation.

Where a statute for the condemnation of lands for a public use provides a definite and complete remedy for obtaining compensation, such remedy is exclusive.

The act of March 3, 1875, 18 Stat. 506, c. 166, " to aid in the improvement of the Fox and Wisconsin Rivers, in the State of Wisconsin," provided a mode for obtaining compensation to persons injured by the taking of their land or their riparian rights in making such improvements; and, as it remained in force for thirteen years, it gave to persons injured a reasonable opportunity for obtaining such compensation, and if they failed to avail themselves of it, they must be deemed to have waived their rights in this respect.

Such an owner, who fails to obtain compensation for the taking of his property for use in a public improvement, by reason of his own neglect in applying for it, cannot violently interfere with the public use, or divert the surplus waters for his own use.

It is not decided whether or not a bill in equity, framed upon the basis of a large amount of surplus water not used, will lie to compel an equitable division of the same upon the ground that it would otherwise run to waste.

Under the circumstances disclosed in this case, there was no taking of the property of the plaintiff in error without due process of law.

THE court stated the case as follows:

This was a complaint in the nature of a bill in equity filed in the Circuit Court of Outagamie County, Wisconsin, by the Green Bay and Mississippi Canal Company against the Kaukauna Water Power Company, and a number of other defendants, lessees and tenants of the Water Power Company, for the purpose of enjoining them from interfering with the plaintiff and its employés while engaged in maintaining, repairing and rebuilding a certain embankment and drain upon a certain lot of land upon the bank of the Fox River, in the State of Wisconsin, and from cutting, tearing away or removing such embankment or drain. The case made by the complaint, pleadings and evidence was substantially as follows:

By an act approved August 8, 1846, 9 Stat. 83, c. 170, Congress granted certain lands to the State of Wisconsin, upon its admission into the Union, for the purpose of improving the navigation of the Fox and Wisconsin Rivers, the former of which is one of the navigable rivers of the State, having an

average flow of 150,000 cubic feet per minute, and affording a water power of 300 horse power per foot fall. By an act approved June 29, 1848, Laws Wisconsin 1848, No. 2, p. 58, the legislature accepted the grant, and by a subsequent act entitled "An act to provide for the improvement of the Fox and Wisconsin Rivers, and connecting the same by a canal," approved August 8, 1848, created a board of public works to superintend the construction of the improvements contemplated by the act of Congress.[1] In this act (sec. 16) the legislature pro-

---

[1] One of the briefs for the plaintiffs in error cited the following sections of this statute.

"SEC. 15. In the construction of such improvements the said board shall have power to enter on, to take possession of and use all lands, waters and materials, the appropriation of which for the use of such works of improvement shall in their judgment be necessary.

"SEC. 16. When any land, waters or materials appropriated by the Board to the use of said improvements shall belong to the State, such lands, waters or materials, and so much of the adjoining land as may be valuable for hydraulic or commercial purposes, shall be absolutely reserved to the State, and whenever a water power shall be created by reason of any dam erected or other improvements made on any of said rivers, such water power shall belong to the State, subject to future action of the legislature.

"SEC. 17. When any lands, waters, or material appropriated by the board to the use of the public in the construction of said improvements shall not be freely given or granted to the State, or the said board cannot agree with the owner as to the terms on which the same shall be granted, the superintendent, under the directions of the board, shall select an appraiser, and the owner shall select another appraiser, who, together, if they are unable to agree, shall select a third neither of whom shall have any interest directly or indirectly in the subject matter, nor be of kin to such owner, and said appraisers, or a majority of them, shall proceed to hear testimony, and to assess the benefits or damages, as the case may be, to the said owner, from the appropriation of such land, water or materials, and their award shall be conclusive unless modified as herein provided. If the owner shall neglect or refuse to appoint an appraiser as herein directed, after ten days' notice of such appointment by the superintendent, then such superintendent shall make such appointment for him.

"SEC. 18. Either party may appeal from such award to the Circuit Court of the County in which the premises may be situated within thirty days after such award may be made and filed with the secretary of the board, and such appeal shall be tried by a jury as other cases commenced in said Circuit Court, and upon the finding of such jury judgment may be rendered in favor of either party, but no execution shall issue thereon against the State.

vided that, "Whenever a water power shall be created by reason of any dam erected or other improvements made on any of said rivers, such water power shall belong to the State, subject to the future action of the legislature." The board was limited by the act, in their contracts and expenditures, to the proceeds of the sale of the lands granted by Congress. In 1851 the State made a contract with Morgan L. Martin for the improvement of the Fox River between Lake Winnebago and Green Bay. At Kaukauna in township 24 N., R. 18 E., were rapids in the Fox River, and the navigation at this point had to be improved by the construction of a dam across the river to secure slack water, and of a canal leading therefrom on the north side of the river to a point below the rapids.

In 1853, the State of Wisconsin, finding itself unable to complete the improvement from the grant made to it, incorporated the Fox and Wisconsin Improvement Company, for the purpose of carrying forward the improvements of these rivers, and relieving the State of its indebtedness on account of the work already done, and from its liability upon its contracts not then executed. The grant was made upon condition that the company should file with the Secretary of State a bond for the vigorous prosecution of the improvement to completion, and for the completion of the same within three years. The bond was further conditioned to pay all the State's in-

---

" SEC. 19. An entry of such award, signed by the appraisers, or a major-- ity of them, or certified by the Clerk of the Court, in case the same shall have been appealed and containing a proper description of the premises appropriated, the names of the persons interested, and the sum estimated for benefits or damages, shall be made in a book, to be kept by the secretary of the board.

" SEC. 20. A transcript of such entry, signed in like manner, acknowledged or proved as a conveyance of land, shall be recorded in the office of the Register of Deeds of the County in which the premises are situated, and the fee simple of said premises shall thereupon vest in the State.

" SEC. 21. If the damages exceed the benefits it shall be the duty of the board to direct the same to be paid out of the fund appropriated to said improvements; proof of such payment or the offer thereof in case the party entitled shall decline to receive the same, shall discharge the State and every person under its employ from any claim for such land, waters and materials appropriated as aforesaid."

debtedness and to save the State harmless from all liability growing out of the improvement. Having complied with all of these conditions, all of the dams, locks, water powers and other appurtenances of said works, and all the said rights, powers and franchises were passed to and vested in the Fox and Wisconsin Improvement Company. Pursuant to the conditions of this grant, the improvement company went on to complete the works as then contemplated, and in its prosecution of the same, in order to secure slack-water navigation around the rapids, in 1853, 1854 and 1855 built a dam at the head of the rapids, so as to raise the water about eight feet above the natural level, reaching from lot 5, section 22, south of the river, to section 24 north of the river, and also built a canal and locks on the north side of the river, reaching from the pond created by the dam to the slack water of the river below the rapids and below the dam. The south end of the dam abutted upon lot 5, now owned by the Canal Company. This dam was built and maintained by virtue of the act of the State, approved August 8, 1848, providing for the completion of such improvement, and there was no other authority for building or maintaining the same. The dam so constructed was maintained by the improvement company and its successor, the Green Bay and Mississippi Canal Company, until 1876, when the United States, having taken title to the improvement, built the new dam now in question, forty feet below the old one, and extended the embankment down the river to meet it. In the belief that it also owned the hydraulic power mentioned in the 16th section of this act, the improvement company bought lands adjacent to the canal for the purpose of rendering such power available.

In order to raise funds for the completion of the work and the payment of the State indebtedness, it mortgaged the property to the amount of $500,000; and, also, under an act of the legislature of October, 1856, made a deed of trust to three trustees of all the unsold lands granted to the State in aid of the improvement, and of all the works of improvement constructed on the river, including the dams, locks, canals, water powers and other appurtenances. This trust deed was subsequently

foreclosed for the purpose of paying the State indebtedness and the bonds issued under the, mortgage, as well as those secured by the trust deed; and the property upon such foreclosure was, sold to a committee, which subsequently became incorporated under the name of the Green Bay and Mississippi Canal Company, plaintiff in this suit, which in this manner became seized in fee of all the improvements, and all the rights, powers and privileges connected with the improvement company, including the dam and canal and all the hydraulic power thereby furnished and the mill lots connected therewith. Plaintiff entered into possession of this property and spent considerable sums in improving, repairing and operating such works of improvement. Finding its expenses largely exceeded the revenue derived from it, an act of Congress was procured in 1870, authorizing the Secretary of War to ascertain the amount which ought to be paid to the plaintiff for its property and rights in the canal, which amount, being subsequently settled by a board of arbitration, a deed was made to the United States of the entire property, with a reservation of the water power created by the dam, and by the use of the surplus water not required for the purposes of navigation, with the rights of protection and reservation appurtenant thereto, and the land necessary to the enjoyment of the same, and acquired with reference to such use.[1]

---

[1] On the 3d of March, 1875, Congress enacted: " That whenever, in the prosecution and maintenance of the improvement of the Wisconsin and Fox Rivers in the State of Wisconsin, it becomes necessary or proper in the judgment of the Secretary of War to take possession of any lands, or the right of way over any lands, for canals and cut-offs, or to use any earth-quarries or other material lying adjacent or near to the line of said improvement and needful for its prosecution or maintenance, the officers in charge of said works may, in the name of the United States, take possession of and use the same, after first having paid or secured to be paid the value thereof, which may have been ascertained in the mode provided by the laws of the State wherein such property lies. In case any lands or other property is now or shall be flowed or injured by means of any part of the works of said improvement heretofore or hereafter constructed for which compensation is now or shall become legally owing, and in the opinion of the officer in charge it is not prudent that the dam or dams be lowered, the amount of such compensation may be ascertained in like manner.    18 Stat. 506, c. 166, § 1.

The dam which furnishes such hydraulic power rests upon the south side of the river on lot 5 of the government survey, which lot in its natural condition was low and scarcely raised above the surface of the water in the river at its natural stage. In order to maintain a head of water in the pond for the purpose of navigation or hydraulic power, it was necessary to build an embankment about ten feet high, and of a thickness and strength sufficient to hold the water in the pond; such embankment was built and extended across the fronts of lots 5, 6 and 7, shortly before the construction of the dam. This lot number 5 was entered by one Denniston in 1835. He afterwards assigned his duplicate therefor to one Hathaway, who received a patent from the United States, August 10, 1837. His title, through several mesne conveyances, became vested in the Water Power Company, May 14, 1880, but no authority was ever obtained from the owner of this lot to erect or abut the dam upon it, or to build an embankment upon it, and no condemnation proceedings under the act of 1848 to obtain an appraisal of damages to such lot were proved at the trial. Lots 6 and 7, also originally entered by Denniston, lie immediately above lot 5, and in their natural state were also low and flat. In 1854, one John Hunt, then the owner in fee of these lots, granted to the improvement company, its successors and assigns, the right to erect and forever maintain an embankment of the dimensions as surveyed by the engineer of said company, reserving the right to "myself to use said embankment when completed, but not so that the same shall be injured through lots 6 and 7; . . . also the privilege of excavating a ditch along the south or east side of said embankment, not exceeding three feet in width." Under and by virtue of such grant, the improvement company built the embankment, and dug the ditch, and the same have ever been maintained under and by virtue of such grant and the legislative act of 1848.

The defendant, the Kaukauna Water Power Company, claiming to own that part of lots 5, 6 and 7, adjacent to Fox River, by purchase of lot 5 from one Beardsley and of lots 6 and 7 from Hunt in 1880, began to excavate and build a canal upon these lands, in order to draw water from the pond on the south

side, and use the same for hydraulic purposes, when plaintiff gave notice in writing of its claim to such hydraulic power, stating that it would resist the breaking of such embankment and the drawing of water from the pond, thereby depriving plaintiff of the use thereof, and of the control of and dominion over the same. The other defendants claimed the right to use the water from the canal of the Water Power Company under, and as tenants of such company. The complaint was dismissed by the Circuit Court, and an appeal taken to the Supreme Court of the State, by which the decree of the Circuit Court was reversed, and the case remanded to that court with instructions to enter judgment for the plaintiff, and for an injunction against the defendants restraining them from drawing any water from the pond maintained by the dam for hydraulic purposes. From the decree so entered by the Circuit Court

MAP OF IMPROVEMENTS.

the Kaukauna Water Power Company and the other defendants sued out this writ of error, claiming that there was drawn in question the validity of a statute of the State, and of an authority exercised under the State, upon the ground of their

repugnance to the Constitution of the United States. A motion to dismiss the writ of error upon the ground that no Federal question was involved was postponed to a consideration of the case upon the merits.

*Mr. David S. Ordway* (with whom was *Mr. Alfred L. Cary*) for plaintiffs in error.

I. The question, as to whether the use was for a public or private purpose, is open here for discussion, notwithstanding the fact that this court usually adopts the construction put upon a state statute by the court of last resort of the State where enacted. *Jefferson Branch Bank* v. *Skelly,* 1 Black, 436; *Bridge Proprietors* v. *Hoboken Co.,* 1 Wall. 116; *McMillen* v. *Anderson,* 95 U. S. 37; *Yick Wo* v. *Hopkins,* 118 U. S. 356; *Crowley* v. *Christensen,* 137 U. S. 92; *Gormley* v. *Clark,* 134 U. S. 348; *Chicago, Milwaukee &c. Railway* v. *Minnesota,* 134 U. S. 418; *Minneapolis Eastern Railway* v. *Minnesota,* 134 U. S. 467; *Johnson* v. *Risk,* 137 U. S. 306.

II. The Kaukauna Company was possessed of the property of which it claims to have been illegally deprived, and that property extended to the centre line, or thread, of the river. *Jones* v. *Pettibone,* 2 Wisconsin, 308; *Olson* v. *Merrill,* 42 Wisconsin, 203; *Norcross* v. *Griffiths,* 65 Wisconsin, 599; *State* v. *Carpenter,* 68 Wisconsin, 165; *Chandos* v. *Mack,* 77 Wisconsin, 573; *Walker* v. *Board of Public Works,* 16 Ohio, 540; *June* v. *Purcell,* 36 Ohio St. 396.

By reason of ownership of the bank and of the bed of the stream, the company was the owner of the use, while passing, of all of the water which might flow over the bed of the stream; in other words, was the owner of all of the water power which could be utilized upon its land. *Webb* v. *Portland Manufacturing Co.,* 3 Sumner, 189; *Stillman* v. *White Rock Manufacturing Co.,* 3 Woodb. & Min. 538; *Parker* v. *Griswold,* 17 Connecticut, 288; *S. C.* 42 Am. Dec. 739; *Cooper* v. *Williams,* 5 Ohio, 391; *S. C.* 24 Am. Dec. 299; *Kaukauna Water Power Co.* v. *Green Bay & Miss. Canal Co.,* 75 Wisconsin, 385.

It could erect and maintain a dam upon its own land across the stream, although navigable, unless the United States, the State of Wisconsin, or some party acting under them, for the protection of navigation, objected. *Fort Plain Bridge Co.* v. *Smith*, 30 N. Y. 44; *Wetmore* v. *Brooklyn Gas Light Co.*, 42 N. Y. 384; *Chenango Bridge Co.* v. *Paige*, 83 N. Y. 178; *Roe* v. *Strong*, 107 N. Y. 350; *Harvard College* v. *Stearns*, 15 Gray, 1; *Boom Co.* v. *Patterson*, 98 U. S. 403.

If the Water Power Company was so possessed of the south bank and the bed of the stream to its centre, with the right to construct such a wing-dam and canal, certainly the State, by the exercise of its undoubted power in the improvement of navigation, forestalled the Water Power Company, and by the erection of the dam in question deprived it of the opportunity of improving and utilizing its water power. The necessity for and object of the embankment was to prevent the overflow of the river and escape of the water; it was a mere continuation of the dam up stream upon the surface of the land of the Water Power Company. The right to place it there could only be acquired by purchase or condemnation. *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166.

In such case the riparian proprietors retain the ownership of the soil, subject to the public easement, unless the language of the statute shows an intention to take the fee for the purpose of the act; the rule being, that in the absence of express words, the courts do not infer that a statute of this kind gives to the public or to a board of conservators or navigation companies, acting in the public interest, a greater interest in the soil than is necessary for the purpose of navigation." See *Lee Conservancy Board* v. *Button*, 12 Ch. D. pp. 400, 401, James, L. J.

III. If taking the property of the Water Power Company was for a private purpose, there will be no dispute but that the law of 1848 was void, because in conflict with the provisions of the Fourteenth Amendment to the Constitution of the United States. *Osborn* v. *Hart*, 24 Wisconsin, 89; *Cole* v. *La Grange*, 113 U. S. 1; *Matter of Deansville Cemetery Assn.*, 66 N. Y. 569.

The right of the riparian owner to have the water of a *navigable* stream flow past his lands adjoining the same as they were accustomed to flow, is as perfect against everybody except the State, or some person or corporation standing in its stead, as it is in the case of *unnavigable* streams; and that right does not, as the state court has decided, depend upon his ownership of the soil under the water, but upon his riparian ownership. *Cohn* v. *Wausau Boom Co.*, 47 Wisconsin, 314, 322. And the right of the State to control the waters of such streams in the public interest is the same whether the ownership of the soil under the water be in the State or in the riparian owner.

It is hardly to be conceived that the legislature of the State of Wisconsin. substantially copying its canal law from those of older States, knowing at the same time that under the constitution of the State there was no power or authority possessed by the State to engage in works of internal improvement, and knowing that the State was prohibited by its constitution from incurring any indebtedness for such purpose, could have intended to take the private property of individuals, for a mere private purpose, and it is only through the construction placed upon the act of 1848 that such a result is accomplished, which construction we bring here for review.

Upon this point, the Supreme Court of Wisconsin, by its judgment now under consideration, has decided that by the 16th and 17th sections of the act of 1848, it was the intention of the legislature to take all such surplus water, and furthermore that such taking was not a necessity — was only a convenience — and that it was a taking for a public purpose. As to both of these points so decided we respectfully submit that the decision of the Supreme Court of the State of Wisconsin is erroneous.

The court, in its opinion, substantially admits that, but for the fact of indivisibility, the taking of the surplus water would be a taking for a private purpose. The courts of New York, Ohio, Michigan and Maryland have had the same, or very similar questions before them, and, as I understand their decisions, have reached conclusions entirely different from those reached

by our Supreme Court in this case, and I respectfully submit more in consonance with justice and correct legal principles. *Buckingham* v. *Smith*, 10 Ohio, 288; *Cooper* v. *Williams*, 5 Ohio, 391; *S. C.* 24 Am. Dec. 299; *Varick* v. *Smith*, 5 Paige, 137; *S. C.* 28 Am. Dec. 417; *Smith* v. *Rochester*, 92 N. Y. 463; *Kane* v. *Baltimore*, 15 Maryland, 240. See also *In re Barre Water Co.*, 62 Vermont, 27.

We submit that this is the only logical disposition of such a question in a jurisdiction which affirms that the absolute ownership of the beds of navigable streams is, *prima facie*, in the owners of the banks; and I respectfully add that I can see, in this case, no reason for refusing to follow such holding to its logical results.

IV. The legislature is not the ultimate judge of how much water is necessary. *Silsby Manufacturing Co.* v. *State of New York*, 104 N. Y. 562.

V. The surplus water power was neither necessary nor convenient for the purposes of navigation.

The plaintiffs in error admit that it was of vital interest to the state, and to those entrusted with the preservation and maintenance of the improvement, that they should have the entire control of the dam, embankments, canals, and all appliances necessary for the purposes of navigation, as well as of the waters necessary for navigation in the pond created by the dam. But they deny that the absolute control of such water involves the ownership or the right to the use of the surplus over and above what is necessary for the purposes of navigation. They deny that the surplus water power is either necessary or convenient for the purposes of navigation.

The authorities are numerous upon the question of what is necessary, and what is merely convenient for public use, and the effect, in either case, upon the right of the public to take *in invitum*. Especially see *Stockton & Visalia Railroad* v. *Stockton*, 41 California, 147; *Varick* v. *Smith, supra; Waddell's Appeal*, 84 Penn. St. 90; *Loan Association* v. *Topeka*, 20 Wall. 655; *Chagrin Falls &c. Road* v. *Cane*, 2 Ohio St. 419.

As the interest of the public was acquired for defined ob-

jects and specified purposes, the land could not be diverted to other purposes or used in a manner substantially different from that for which it was appropriated, without relieving it from the incumbrance, and restoring the owner to the absolute dominion he had before it was taken. See *Nashville & Chattanooga Railroad* v. *Cowardin*, 11 Humph. 348; *Memphis Freight Co.* v. *Memphis*, 4 Coldwell, 419; *West River Bridge Co.* v. *Dick*, 6 How. 507.

Wherever the taking of private property for public use is provided for by a general law, which does not itself describe the property to be taken, the question whether the use is public is for the courts to determine in each individual case as it arises. *Hobart* v. *Milwaukee City Railroad*, 27 Wisconsin, 194.

All the facts bearing upon this question are set out in the record, and the court below does not seem to disagree with us as to the fact that the use, for hydraulic purposes, is *prima facie*, private. It could not well come to any other conclusion, in view of the declaration of the court in the *Eau Claire Case*, 40 Wisconsin, 533. It there declares that a statute which authorized the erection of a dam at public cost across a navigable river, either for the purpose of water works for the city, or for the purpose of leasing the water power for private purposes, was unconstitutional and void, because the power so granted was alternative and optional, either for public or private use, thus leaving it possible to be used for private purposes solely. But the court below distinguishes the case at bar upon its peculiar facts, and holds, contrary to the New York, Ohio and Maryland cases cited, and in direct opposition to all of the facts shown by the record that all of the surplus water power is a mere accidental excess, an unavoidable incident to the power to construct and maintain the dam, and that such surplus water is practically inseparable from the water necessary for the purposes of navigation. This conclusion is supported by two adjudicated cases only, that is to say, *The State* v. *Eau Claire*, 40 Wisconsin, 533, and *Spaulding* v. *Lowell*, 23 Pick. 71; in neither of which it is submitted, was involved the proposition in support of which they are cited.

*Spaulding* v. *Lowell* has been followed in many cases. See *George* v. *Mendon School District*, 6 Met. 497; *Hood* v. *Lynn*, 1 Allen, 103; *French* v. *Quincy*, 3 Allen, 9; *Minot* v. *West Roxbury*, 112 Mass. 1. In none of them, and in no other case which we have been able to find, has the accidental surplus or excess consisted of anything except a portion of that which had necessarily been taken for a public purpose. We therefore submit that, upon all the facts in the record, and all the authorities which have thus far been referred to by either of the parties to this case, the taking of the surplus water power, by the judgment of the court below, was for a private purpose and that, therefore, the judgment should be reversed.

VI. The act of Congress of 1875 failed to supply a just compensation.

The Wisconsin act of August 8, 1848, was void, for the reason that it allowed the "appraisers to assess the benefits or damages, as the case might be, to the owner from the appropriation of such land, water or materials," and only provided for the payment of damages to the owner if they exceeded the benefits.

It is the settled law of Wisconsin that the value of property taken must be paid, and that it cannot be reduced by offsetting against it benefits which may be assessed. *Robbins* v. *Milwaukee & Horicon Railroad*, 6 Wisconsin, 636; *Blesch* v. *Chicago & Northwestern Railway*, 48 Wisconsin, 168; *Bohlman* v. *Green Bay &c. Railway*, 40 Wisconsin, 157; *Powers* v. *Bears*, 12 Wisconsin, 213; *S. C.* 78 Am. Dec. 733.

The defects in the state statute of August 8, 1848, were not remedied, nor was just compensation for the property of the Water Power Company so taken supplied by the act of Congress of March 3, 1875, c. 166.

The Supreme Court, in its judgment below, held that that act was equivalent to the provisions of the state statute with reference to highways, when it only authorized an action to be brought against the United States in the courts of the State of Wisconsin, to obtain a judgment for its damages so claimed. In this it is respectfully submitted that the court below erred, and that the act of Congress relied upon, even if

it was intended to apply to cases of this kind, furnished no adequate mode for obtaining compensation, because, supposing the Water Power Company to be fortunate enough to obtain a judgment for its damages, it was then nearly as far from the possession of compensation as it was before the commencement of proceedings. Not one dollar could be had until an appropriation could be obtained through some act of Congress. It was left to trust to "the future justice of Congress."

It seems to us that this exact question was decided in the case of *Connecticut River* v. *Franklin County Commissioners*, 127 Mass. 50; the opinion was by Gray, C. J. The doctrine in that State is no more stringent and exacting as to prepayment, or the provision of a sure and adequate fund than in Wisconsin, but the case goes further and points out what is not such a sure and adequate provision.

In this respect there would seem to be an irreconcilable conflict between the decision of the Supreme Court of Massachusetts and that of the Supreme Court of Wisconsin brought here for review, and we respectfully submit that the Supreme Court of Wisconsin carried the doctrine of substituted payment far beyond any previously adjudged case, and that the doctrine of the Supreme Court of Massachusetts is more nearly in accord with all prior decisions of the Supreme Court of Wisconsin, than is its decision which is now brought here for review.

But suppose (for the purpose of this argument only) that the act of Congress of 1875 did furnish adequate provision for payment after that date of just compensation for water power taken, it could not possibly, by relation or otherwise, render the act of August 8, 1848, valid or effectual for the taking and passing title to the water power in question, at any time prior to the approval of the act, to wit, March 3, 1875.

The concurring opinion of Mr. Justice Bradley in *Davidson* v. *New Orleans*, 96 U. S. 97, stated clearly the doctrine for which we contend; and it was approved in *Hagar* v. *Reclamation District*, 111 U. S. 701.

*Mr. Moses Hooper* for defendant in error.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

(1) The only question involved in this case proper for us to consider, is whether the act of the legislature of Wisconsin of August 8, 1848, reserving to the State the water power created by the erection of the dam over the Fox River, as construed by the Supreme Court of the State, and the proceedings thereunder, operated to deprive the plaintiffs in error of their property without due process of law. Notwithstanding the inhibition of the Constitution is not distinctly put in issue by the pleadings, nor directly passed upon in the opinion of the court, it is evident that the court could not have reached a conclusion adverse to the defendant company without holding, either that none of its property had been taken, or that it was not entitled to compensation therefor, which is equivalent to saying that it had not been deprived of its property without due process of law. This court has had frequent occasion to hold that it is not always necessary that the Federal question should appear affirmatively on the record, or in the opinion, if an adjudication of such question were necessarily involved in the disposition of the case by the state court. *Willson* v. *Blackbird Creek Marsh Co.,* 2 Pet. 245; *Armstrong* v. *Athens County,* 16 Pet. 281; *Chicago Life Insurance Co.* v. *Needles,* 113 U. S. 574; *Eureka Lake Co.* v. *Yuba County,* 116 U. S. 410.

It is argued by the defendant in error that, inasmuch as the act of the legislature complained of was enacted in 1848, and the Fourteenth Amendment to the Constitution was not adopted until 1868, the provision of the latter against the "depriving" a person of property without due process of law has no application to this case. There are several answers made by the plaintiff in error to this contention: First. It was not the act itself which deprived the Water Power Company of its property, but the proceedings taken under the act, and so far as such proceedings were taken subsequent to the constitutional amendment, they fall within its inhibition. It may well be doubted whether the mere construction of the dam

and embankment operated of itself to deprive the owner of lot 5 of any right to the water power, as the water continued to flow past the lot as it had previously done, though at a higher level than before. Be this as it may, however, it is possible that the notice given by the Canal Company, in 1880, of its claim to the exclusive right to this water power may be considered as a deprivation within the meaning of the amendment. Until this time there had been no active interference with any claim or riparian rights belonging to the Water Power Company. Second. If the erection of the dam and embankment be treated as an assertion of an exclusive right to the water power in front of these lots, perhaps the maintenance of this dam and embankment may be regarded as a continuous deprivation of the rights of the riparian owner to such water power, within the meaning of the constitutional provision. The act of deprivation continues so long as the Canal Company maintains its paramount and exclusive right to the use of the water flowing in front of such lot. Third. While it is undoubtedly true that the first dam and embankment were constructed in the years 1853 to 1855, before the constitutional amendment was adopted, the new dam, the southerly end of which also abutted on lot 5, as well as the embankment connecting this with the old dam, was not built until 1876 ; and in the construction of these the Water Power Company claims that it was deprived of its property without due process of law. The allegation of the answer in this connection is " that the dam which now raises the water of said Fox River for the filling of said government canal, in the said complaint mentioned, is not the same dam which was built by the board of public works, and in said complaint referred to; that, after the United States became the owner of said canal and water-way, and in about the year 1874, the United States abandoned said old dam and built a new one,  . . . the southerly half of which said new dam and which point of abuttal is upon land which, prior to, and at the time of, the commencement of this suit, belonged to, and was in the possession of, and still belongs to, and is in the possession of, the defendant, the Kaukauna Water Power Company ; . . . that,

after the building of said new dam by the United States, as aforesaid, it, the said United States, constructed and extended the said embankment along the southerly shore of said Fox River, on said lot 5, from the said old dam down stream to, and joined and terminated the same upon, its said new dam, as the same is now in use ; and these defendants state, upon information and belief, that neither the United States or any other party ever, by purchase, condemnation, dedication, or in any other way, acquired, of or from the owner of said lot 5, the right to so construct or abut said new dam upon said lot 5, or to so lengthen or construct said new part of said embankment thereupon," etc.

We think these facts and allegations are sufficient to raise the constitutional question whether the property of the Water Power Company has been taken without compensation, and that the motion to dismiss should, therefore, be denied.

(2) The act of the legislature of Wisconsin of August 8, 1848, in so far as it provided that the water power created by the dam erected, or other improvements made on the river, should belong to the State, is claimed to be invalid upon the ground, first, that it purported to take private property for a private purpose ; and second, that if it were held to be the taking of private property for a public purpose, it was void under the constitution of the State, and not due process of law, because the act did not provide a method of ascertaining and making compensation for the property so taken. Practically the only question is, whether this act was valid in so far as it authorized the State to take and appropriate the water power in question.

It is the settled law of Wisconsin, announced in repeated decisions of its Supreme Court, that the ownership of riparian proprietors extends to the centre or thread of the stream, subject, if such stream be navigable, to the right of the public to its use as a public highway for the passage of vessels. *Jones* v. *Pettibone*, 2 Wisconsin, 308 ; *Walker* v. *Shepardson*, 2 Wisconsin, 384 ; *S. C.* 4 Wisconsin, 486 ; *Norcross* v. *Griffiths*, 65 Wisconsin, 599. In *City of Janesville* v. *Carpenter*, 77 Wisconsin, 288, 300, it is said of the riparian owner : " He may construct

docks, landing places, piers and wharves out to navigable waters if the river is navigable in fact, but if it is not so navigable he may construct anything he pleases to the thread of the stream, unless it injures some other riparian proprietor, or those having the superior right to use the waters for hydraulic purposes. . . . Subject to these restrictions, he has the right to use his land under water the same as above water. It is his private property under the protection of the constitution, and it cannot be taken, or its value lessened or impaired, even for public use, 'without compensation,' or 'without due process of law,' and it cannot be taken at all for any one's *private* use." With respect to such rights, we have held that the law of the State, as declared by its Supreme Court is controlling as a rule of property. *Barney* v. *Keokuk*, 94 U. S. 324; *Packer* v. *Bird*, 137 U. S. 661; *Hardin* v. *Jordan*, 140 U. S. 371. There is no doubt, under the facts of this case, that the owner of lot 5 was entitled to compensation for the land appropriated by the State in the construction of the dam and of the embankment in front of the lot. To what extent he was entitled to the use of the water power created by the dam, as against the public and the other riparian owners, may be difficult of ascertainment, depending as it does largely upon the number of proprietors, the width and depth of the river, the volume of the water, the amount of fall, and the character of the manufactures to which it was applicable. Nor is it necessary to answer the question in this case, since it appears that, whatever this property is, it has been appropriated and no provision made for the compensation of the owner.

The case of the plaintiff Canal Company depends primarily, as stated above, upon the legality of the legislative act of 1848, whereby the State assumed to reserve to itself any water-power which should be created by the erection of the dam across the river at this point. No question is made of the power of the State to construct or authorize the construction of this improvement, and to devote to it the proceeds of the land grant of the United States. The improvement of the navigation of a river is a public purpose, and the sequestration or appropriation of land or other property, therefore, for such

purpose, is doubtless a proper exercise of the authority of the State under its power of eminent domain. Upon the other hand, it is probably true that it is beyond the competency of the State to appropriate to itself the property of individuals for the sole purpose of creating a water power to be leased for manufacturing purposes. This would be a case of taking the property of one man for the benefit of another, which is not a constitutional exercise of the right of eminent domain. But if, in the erection of a public dam for a recognized public purpose, there is necessarily produced a surplus of water, which may properly be used for manufacturing purposes, there is no sound reason why the State may not retain to itself the power of controlling or disposing of such water as an incident of its right to make such improvement. Indeed, it might become very necessary to retain the disposition of it in its own hands, in order to preserve at all times a sufficient supply for the purposes of navigation. If the riparian owners were allowed to tap the pond at different places, and draw off the water for their own use, serious consequences might arise, not only in connection with the public demand for the purposes of navigation, but between the riparian owners themselves as to the proper proportion each was entitled to draw — controversies which could only be avoided by the State reserving to itself the immediate supervision of the entire supply. As there is no need of the surplus running to waste, there was nothing objectionable in permitting the State to let out the use of it to private parties, and thus reimburse itself for the expenses of the improvement.

The value of this water power created by the dam was much greater than that of the river in its unimproved state in the hands of the riparian proprietors who had not the means to make it available. These proprietors lost nothing that was useful to them except the technical right to have the water flow as it had been accustomed and the possibility of their being able some time to improve it. If the State could condemn this use of the water with the other property of the riparian owner it might raise a revenue from it sufficient to complete the work which might otherwise fail. There was

every reason why a water power thus created should belong
to the public rather than to the riparian owners. Indeed, it
seems to have been the practice, not only in New York but in
Ohio, in Wisconsin, and perhaps in other States, in authorizing
the erection of dams for the purpose of navigation or other
public improvement, to reserve the surplus of water thereby
created to be leased to private parties under authority of the
State; and where the surplus thus created was a mere incident
to securing an adequate amount of water for the public im-
provement, such legislation, it is believed, has been uniformly
sustained. Thus, in *Cooper* v. *Williams*, 4 Ohio, 253, the law
authorizing the construction of the Miami Canal, from Dayton
to Cincinnati, empowered the canal commissioners to dispose
of the surplus water power of the feeder for the benefit of the
State, and their action in so disposing of the water was justi-
fied. The ruling was repeated in the same case, 5 Ohio, 391.
In *Buckingham* v. *Smith*, 10 Ohio, 288, it was held that, if
the water of private streams should be taken by the State for
the mere purpose of creating hydraulic power, and rented to
an individual, the transaction would be illegal, and no title
would pass as against the owner; but it was intimated that in
conducting water through a feeder, a discretionary power must
necessarily rest in the agents of the State, and in making pro-
vision for a supply, it must frequently occur that a surplus
will accumulate, and that such surplus might be subject to
lease by the commissioners. In *Little Miami Elevator Co.* v.
*Cincinnati*, 30 Ohio St. 629, 643, the right to lease surplus
water for private use was recognized as an incident to the
public use of a canal for the purpose of navigation; but it was
held that such use was a subordinate one, and that the right
to the same might be terminated whenever the State, in the
exercise of its discretion, abandoned or relinquished the public
use. It was doubted whether the State could, after abandon-
ing the canal as a public improvement, still reserve to itself
the right to keep up a water power solely for private use and
as a source of revenue. "By so doing," said the court, "the
water power would cease to be an incident to the public use,
and the State would be engaged in the private enterprise of

keeping up and renting water power after it ceased to act as a government in keeping up the public use." The same ruling was made by this court in *Fox* v. *Cincinnati*, 104 U. S. 783. See also *Hubbard* v. *City of Toledo*, 21 Ohio St. 379. In *Spaulding* v. *Lowell*, 23 Pick. 71, 80, it was held that, where a town built a market house two stories high, and appropriated the lower story for a market, it being *bona fide* their principal and leading object in erecting the building, the appropriation of the upper story to other subordinate purposes was not such an excess of authority as to render the erection of the building and the raising of money therefor illegal. Chief Justice Shaw, in delivering the opinion of the court, said : "If this had been a colorable act, under the pretence of exercising a legal power, looking to other and distinct objects beyond the scope of the principal one, it might be treated as an abuse of power, and a nullity. But we perceive no evidence to justify such a conclusion in the present case. The building of a market house was the principal and leading object, and everything else seems to have been incidental and subordinate. . . . If the accomplishment of the object was within the scope of the corporate powers of the town, the corporation itself was the proper judge of the fitness of the building for its objects, and it is not competent in this suit to inquire whether it was a larger and more expensive building, than the exigencies of the city required." See also *French* v. *Inhabitants of Quincy*, 3 Allen, 9. In *Attorney General* v. *Eau Claire*, 37 Wisconsin, 400, it was broadly held that where the State was authorized to erect and maintain a dam for a public municipal use, the legislature might also empower it to lease any surplus water power created by such dam. The ruling was repeated in *State* v. *Eau Claire*, 40 Wisconsin, 533.

The true distinction seems to be between cases where the dam is erected for the express or apparent purpose of obtaining a water power to lease to private individuals, or where in building a dam for a public improvement, a wholly unnecessary excess of water is created, and cases where the surplus is a mere incident to the public improvement and a reasonable provision for securing an adequate supply of water at all times for such

improvement.  No claim is made in this case that the water power was created for the purpose of selling or leasing it, or that the dam was erected to a greater height than was reasonably necessary to create a depth of water sufficient for the purposes of navigation at all seasons of the year.  So long as the dam was erected for the *bona fide* purpose of furnishing an adequate supply of water for the canal and was not à colorable device for creating a water power, the agents of the State are entitled to great latitude of discretion in regard to the height of the dam and the head of water to be created; and while the surplus in this case may be unnecessarily large, there does not seem to have been any bad faith or abuse of discretion on the part of those charged with the construction of the improvement.  Courts should not scan too jealously their conduct in this connection if there be no reason to doubt that they were animated solely by a desire to promote the public interests, nor can they undertake to measure with nicety the exact amount of water required for the purposes of the public improvement.  Under the circumstances of this case, we think it within the power of the State to retain within its immediate control such surplus as might incidentally be created by the erection of the dam.

So far, however, as land was actually taken for the purpose of this improvement, either for the dam itself or the embankments, or for the overflow, or so far as water was diverted from its natural course, or from the uses to which the riparian owner would otherwise have been entitled to devote it, such owner is undoubtedly entitled to compensation.  So far as concerns lots 6 and 7, no such compensation could be claimed, since the Supreme Court held, and we think correctly, that the release executed by Hunt to the Fox and Wisconsin Improvement Company in 1854, in which he granted to that company and its representatives " the right to erect and forever maintain an embankment of the dimensions as surveyed by the engineer of said company," operated as a surrender of all riparian rights appertaining to such lots not reserved in the instrument.  No such grant, however, was proven to have been made with respect to lot 5, then owned by one Beardsley, to which the

Water Power Company now holds the title.   Inasmuch as the dam abuts upon this lot, its owner was doubtless entitled to compensation for the land occupied by the dam and embankment, as well as for the value of the use of the water diverted from its natural course.   The 17th section of the act of 1848 attempted to provide for such compensation by enacting that "when any lands, waters or materials, appropriated by the board to the use of the public in the construction of said improvements, shall not be freely given or granted to the State, or the said board cannot agree with the owner as to the terms on which the same shall be granted," the superintendent shall take measures to secure the appointment of appraisers to assess the benefits or damages to the owner from the appropriation of the land, etc., with a further provision that if the damages exceeded the benefits it should be the duty of the board to direct the same to be paid " out of the fund appropriated to said improvements."   It was held, however, by the Supreme Court of Wisconsin in *Sweaney* v. *United States*, 62 Wisconsin, 396, as well as in the present case, that it failed to give the land owner the right to institute condemnation proceedings under it to have his compensation determined; and, that if the State should institute such proceedings, the condemnation when determined was, by section 21 of the act, made payable out of the fund appropriated for such improvements, and for these reasons the act did not make adequate provision for the compensation of the owners.   The construction thus given to this act is obligatory upon this court.

In 1875, however, Congress passed an act, 18 Stat. 506, to aid in the improvement of the Fox and Wisconsin Rivers, the first section of which provided that "in case any lands or other property is now or shall be flowed or injured by means of any part of the works of said improvement heretofore or hereafter constructed for which compensation is now or shall become legally owing, and in the opinion of the officer in charge it is not prudent that the dam or dams be lowered, the amount of such compensation be ascertained," etc.   It is claimed in this connection that there was nothing in the contract of purchase made between the government and the

Canal Company, by which the government was bound to pay anything for, or on account of, the property which it did not take and which was excepted in the deed; that the water power created by the Kaukauna dam, and by the use of the surplus water not required for the purposes of navigation, was a part of the excepted property which the government did not purchase; that whatever title the Canal Company had to such water power and such surplus water at the time of its conveyance, it kept, and nothing more; that if its title was defective, or it had none, the government was in nowise bound to make the same good or supply it; and that to compel the government now to pay for the water power, would require it to make a payment it never assumed to make, and for property it had no title to or interest in. If there were anything in this point, it is one which should more properly be made by the government, and if the government has seen fit, as it did, to reimburse the riparian owners for all their damages, it comes with ill grace from the mouth of the Water Power Company to set up the exemption.

This construction, however, in our opinion is too narrow and technical. The only authority by which private property could be taken or overflowed was one derived from the State or general government; whatever appropriation was made, or injury done to such lands, was done solely for the benefit of the public, and it was right the public should pay the compensation therefor. There is no sound reason for a distinction in regard to compensation between the property conveyed and the property excepted from the conveyance — the latter being a mere incident to the former. The Fox and Wisconsin Improvement Company, in receiving title from the State, did not undertake to reimburse the riparian proprietors for damages to their lands, and it was inequitable that it should be called upon to do so. It was said by this court in *United States* v. *Jones*, 109 U. S. 513, 514, speaking of the act of 1870 authorizing the purchase of the improvements: "Some of the dams constructed had caused the lands of several parties to be overflowed, and in the estimate of the amount to be paid by the United States no account was taken of the liability of the

company for such damages. The question, therefore, soon arose whether the payment of these damages devolved upon the United States; and this question was submitted by the Committee on Commerce of the House of Representatives to the Secretary of War, and was by him referred to the Assistant Judge Advocate General. That officer held that liability for the damages incurred from the flowage of water on the lands of others, caused by the works constructed, followed the property transferred and devolved on the United States." It is true that the defendant in error could not by its deed of 1870, or by any reservation of the water power therein contained, saddle the government with the burden, but it was a burden already existing, which could not be discharged until the proper compensation had been provided. The land was not taken for the purpose of creating a water power, but for improving the navigation of the river, and there was no reason for charging the defendant in error, which had reserved the water power only, with the payment of compensation. The question of compensation is one separate and apart from the transfers of which this property was the subject, but one which in honor as well as in law was chargeable upon the public. The act of 1875 in question seems to have originated from the report of the Assistant Judge Advocate General, upon whose opinion a bill was prepared for the assumption by the United States of the company's liability for such damages. The terms of this act are broad enough to cover not only lands taken for flowage purposes, but all injury done to lands or other property by means of any part of the works of said improvement, which would include damages caused by the diversion of the water. It is true that this act, after remaining in force about thirteen years, seems to have been repealed by the deficiency bill of 1888, 25 Stat. 4, 21, which, after making appropriation for the payment of flowage damages to about 125 different claimants, declared that the United States should not be "held liable for damages heretofore or now caused by the overflow of the lands or other property of any person . . . unless the action or proceeding to ascertain and determine the amount . . . shall have been or shall

be commenced  .  .  .  prior to the passage of this act; and all claims and causes of action now existing upon which no proceeding has been already or shall be taken within the time last specified to enforce the same shall be forever barred." Congress was not obliged to keep the act of 1875 in operation forever, and reasonable opportunity having been afforded to the plaintiffs in error to obtain compensation for the damages sustained by the construction of the improvement, we think they must be deemed to have waived their right to them.

Where a statute for the condemnation of lands provides a definite and complete remedy for obtaining compensation, this remedy is exclusive; the common law remedy or proceeding is superseded by the statute, and the owner must pursue the course pointed out by it. Mills on Eminent Domain, sections 87, 88. It is true that, if the statutory remedy be incomplete or imperfect, the owner is not thereby debarred from his common law remedy and may recover his damages in an action of trespass or ejectment. But it does not follow even from this that he has a right, especially after acquiescing in the appropriation of his land for a number of years, to take the law into his own hands, and *manu forti* repossess himself of his own. Thus, if a railway company, without condemnation proceedings, took possession of a lot of land for its track and ran its trains over it for the time which elapsed in this case between the building of the dam and the cutting of the embankment by the plaintiffs in error, it would scarcely be claimed that the owner could enter upon the land, tear up the rails, and throw his fences across the road-bed. Such a proceeding was attempted in *State* v. *Hessenkamp*, 17 Iowa, 25, and the result was an indictment for wilfully obstructing the track. The court declined to instruct the jury that if the defendant owned the land, and the railroad company had not obtained a right of way over it, defendant had a right to place what he pleased upon the land, and should be acquitted; and the Supreme Court said of this refusal that it was so obviously right that "we can scarcely believe it is expected of us to undertake a vindication of its correctness." So in *Dunlap* v. *Pulley*, 28 Iowa, 469, the defendant, during his term of office

as road supervisor, fenced up and obstructed a certain county road which had been laid out over a tract of land owned by him, claiming the right to do so upon the ground that he had never been paid a just compensation. The court held, however, that though entitled to compensation, he was entitled to it only in the manner provided by law. "If he failed to ask for compensation, or failed to apply in time, or applying, was unsuccessful in showing his right thereto, he could not, upon any principle, resist the right of the public to open the road, upon the ground that he has not been paid for injuries or losses which he claims to have sustained. If the board rejected his claim because not properly presented, because not preferred in time, or upon any ground, (having jurisdiction so to decide,) his remedy was by appeal."

Under the circumstances of this case we do not think it was within the power of the owner of lot 5, after acquiescing for over twenty-five years in the construction of the dam, and the exclusive appropriation of the water by the State, to treat their proceedings as a nullity, and take such action as could only be justified upon the theory that the State and the Canal Company had acquired no rights by its long silence. The claim of the Water Power Company is to cut the embankment erected by authority of the State, and to draw off one-half of the surplus water power of the pond, upon the ground that it is now the owner of the southern bank of the river, and this, too, without taking any legal proceedings in assertion of this right so to do. Its position necessarily assumes that, by virtue of its ownership of lot 5 (all damages connected with lots 6 and 7 having been released by their then owner, Hunt), it is entitled to one-half of the water created by this improvement, and that, too, without reference to the riparian rights properly appurtenant to lot 5 before the improvement was made, or to any particular fall from the upper to the lower corner of such lot. It is difficult to see how, under these circumstances, this claim can be sustained. The dam was built for a public purpose, and the act provided that if, in its construction, any water power was incidentally created, it should belong to the State, and might be sold or leased, in order that the proceeds of such sale

or lease might assist in defraying the expenses of the improvement. A ruling which would allow a single riparian owner upon the pond created by this dam to take to himself one-half of the surplus water without having contributed anything towards the creation of such surplus or to the public improvement, would savor strongly of an appropriation of public property for private use. If any such water power were incidentally created by the erection of a dam, it was obviously intended that it should belong to the public and be used for their benefit, and not for the emolument of a private riparian proprietor. The cutting of the embankment under the circumstances of this case and the appropriation of the surplus water which the Water Power Company had had no hand in creating, was a trespass which the court had a right to enjoin.

We do not undertake to say whether a bill in equity, framed upon the basis of a large amount of surplus water not used, might not lie to compel an equitable division of the same upon the ground that it would otherwise run to waste.

Our conclusion is that there was no taking of the property of the plaintiff in error without due process of law, and the decree of the Supreme Court of Wisconsin is

*Affirmed.*

Mr. Justice Harlan dissented.