## ASHWANDER et al. v. TENNESSEE VALLEY AUTHORITY et al.
### No. 355.

District Court, N. D. Alabama, N. E. D.

Feb. 22, 1935.

See, also, 9 F. Supp. 800.

Forney Johnston, of Birmingham, Ala., for plaintiffs.

James Lawrence Fly, of Knoxville, Tenn., for Tennessee Valley Authority.

GRUBB, District Judge.

The law in this case was settled on the motion to dismiss for want of equity. 8 F. Supp. 893. I do not mean settled for good, but settled as far as this case is concerned, in the District Court. It was settled in this way: That under the Tenth Amendment, or regardless of it, the government of the United States would have no right, within the limits of a state, to conduct any private proprietary business unless it did so in a way that was tied to some express or implied constitutional grant of power. If it was tied to such a grant of power, then the power carried with it the proprietary business and the right to operate it on the part of the government in the state, and, in fact, the government has a paramount right over the state in that case. Therefore, the question that was left open was whether the government was operating a proprietary business, and whether it was attached to any specific grant of power, express or implied, under the Constitution.

Those are the questions of fact we are trying, as I understand it, on this trial. I told counsel that, while the bill contained many things, the only one that I would regard would be the validity of the contract or transaction between the Alabama Power Company, which the preferred stockholders are assailing, and the Tennessee Valley Authority; that is to say, the contract conveying the transmission lines, and making certain arrangements about the interchange of power. January 4, 1934, I believe, was its date; and also in connection with it, the contract of August 9th, which was the option to buy certain distribution systems, which was not exercised by the Tennessee Valley Authority, but which, it seems to me, throws light on their purpose in buying the transmission lines; and it seems to me clear from all the evidence, and from the nature of the transaction itself, that the Tennessee Valley Authority purchased what they did from the Alabama Power to enable

it to conduct the same kind of business that the Alabama Power theretofore did with that same equipment, transmission, and so forth, i. e., the business of a utility, making and distributing electric energy. Now, its right to do that is dependent upon a showing that in the conduct of some granted constitutional power it needed this electric power, and that either there was a surplus, or that in some other way the electric power was connected with the constitutional power; so that it would have the right not only to make it, but to sell it. The attempt has been in this trial to show by the plaintiff, first, that the transaction with the Alabama Power was one that put it in the business of operating a utility business in Alabama; and, second, that there was no grant of power to which that business could be attached. And on the other hand, the defendants have controverted the first question, and, controverting the second question, they offer evidence tending to show that it was connected with either the power of navigation or with interstate commerce or the power of national defense.

There is no doubt, under my ruling on the motion, and as I see it under the law, that, if it is attached to any one of those powers, the making and selling and distributing, both wholesale and retail, of electric energy, is legal. On the other hand, if it cannot be attributed to any one of those powers, then the Tennessee Valley Authority would be in the attitude of conducting for the government, since it is a governmental instrumentality, a completely owned subsidiary of the government, a business in the state of Alabama, in a proprietary way and without any power to attach that business to; and in that case it would be an unauthorized ultra vires business and could not be conducted legally.

Now, whether the act creating the Tennessee Valley Authority (16 USCA §§ 831–831cc) is unconstitutional or not is a matter of debate which I do not find it necessary to pass on, either on the proposition of the delegation of powers beyond what is legislatively proper or what is constitutional, or whether on the question of authorizing a business to be conducted, that the Constitution does not authorize Congress to authorize this corporation to conduct. I have not looked into the question of nondelegable powers, and do not pass on it. As to the other, it seems to me that the fair construction of the act might limit the right of the Tennessee Valley Authority to sell any energy that was not surplus energy, and it

has that authority under the decision of the Supreme Court, as I understand it. United States v. Chandler-Dunbar Water Co., 229 U. S. 53–73, 33 S. Ct. 667–670, 57 L. Ed. 1063; Kaukauna Water Co. v. Green Bay & M. Canal Co., 142 U. S. 254–275, 12 S. Ct. 173–178, 35 L. Ed. 1004. It has a right to sell the surplus energy defined to be the energy over and above what the Tennessee Valley Authority creates for the use of some one of its granted constitutional powers, and used for that purpose; for instance, actuating of the locks with reference to navigation, the lighting of villages, or many other things of that kind, that give it the right to use electrical energy. If there is a surplus, recognizing the impossibility of making the exact amount of electric power to cover the needs, it has an implied right to sell any power created over and above that, provided that surplus is legitimately created; that is, created in the exercise of a bona fide effort to only make such power as is needed to carry on the constitutional power, either national defense or navigation, or perhaps others.

Now I get the idea from the proof that the directors in the administration of the affairs of the Tennessee Valley Authority have not planned to dispose of merely a surplus of that kind, but, on the contrary, that they have so treated any surplus created by them of any size and without any regard to its being created for the physical needs, and have done so with the expectation of disposing of it either in the way of furnishing an example as to how cheap power could be made when the government made it, or in aid of the social experiment that is being conducted in the Valley, or in order to reimburse the treasury by marketing power having no physical or functional relation to regulation of navigation or national defense.

I believe that the evidence shows that there is no substantial relation between the power created and disposed of and intended to be disposed of under the plan of the Tennessee Valley Authority, and a surplus that is merely over what is needed to carry the government operation on physically; and that cannot be made exact, and is, therefore, an approximation. I do not believe that the idea of the Tennessee Valley Authority in making the power and planning like they have planned is that. I think their idea is that anything is a surplus which is over and above what they actually use, and that that gives them the right to generate what they see fit, and, in fact, to plan an independent

utility system, permanent in character, and supported by twenty or thirty year contracts before the governmental use is defined.

As I see it, it would be essential to be shown either that this power that is being disposed of, or intended to be disposed of, was actually needed for some of these constitutional functions, or that it was the excess over and above what was so created by that function, and the amount used, and that what was created in excess was created in good faith and not with an intention to make a different disposition of it while it was being created and when it was being distributed.

■ So, that being the case, it seems to me that the evidence does show that it is not a surplus, and that it is not to be attributable to any constitutional power; and, therefore, it leaves the Tennessee Valley Authority, in its disposition of it, in the attitude of a proprietary utility, just as the Alabama Power Company was before it made this contract, and, therefore, that its doing so is ultra vires of its right as a corporation, and that its directors in so doing acted ultra vires of their charter, and in violation of the limitations on the power of Congress.

■ The plaintiffs must assume all injury from legal competition. That is something they would have to accept without legal redress. But, if the Tennessee Valley Authority had no right to engage in the business of making, and transmitting, and distributing, either through themselves or these municipal corporations, electric energy as a business, then that competition arising out of an illegal business could be complained of by the Alabama Power Company, and in the event it refused to do so, by its stockholders.

■ With reference to the restraining of the making of the loans offered by the P. W. A. to the municipal corporations, the P. W. A. was authorized to lend government money to municipal corporations with which to build or buy distributing plants for electric energy, under the general welfare clause, and in the interest of re-employment. The law of Alabama authorized the municipal corporations to receive such loans for such purpose. If there is any infirmity in the loan agreement, it arises from the fact that the Tennessee Valley Authority is a party to the loan transaction, in that the loans are to

be based on contracts for Tennessee Valley Authority power and are granted in part in order to supply a market for Tennessee Valley Authority. The record shows that the Tennessee Valley Authority was instrumental in procuring the P. W. A. to agree to make the loans, and that their purpose was known to the Tennessee Valley Authority, the P. W. A., and the municipal corporations, when they were agreed to be made. The municipal corporations, to secure the loans, agreed to distribute the energy of the Tennessee Valley Authority, and sell it at prices, satisfactory to the Tennessee Valley Authority, to consumers, and this was known to the P. W. A. and was a part of the consideration which induced it to grant the loans. If all parties to the tripartite loan transaction entered into it, knowing that the money was to be used to aid the Tennessee Valley Authority in disposing of its energy to consumers in violation of law, through the municipal corporations, then the loan agreement would have been made in aid of an illegal business, and with that purpose on the part of the lender, the borrowers, and the offending Tennessee Valley Authority, and its performance should be restrained by reason of the illegality. If the Tennessee Valley Authority was illegally conducting a utility business, and the loans were to be made to aid it, with the knowledge and intent of all the parties, the loans should be restrained, where intended to construct systems to purchase Tennessee Valley Authority power under the circumstances above stated.

I have found that the Tennessee Valley Authority was illegally engaged in the business of making and selling electric energy, and that the loans were made to aid it; whether the Tennessee Valley Authority and P. W. A. are considered as one entity, the United States, or separate entities, which had agreed together and with the municipal corporations, and with knowledge, the same result would obtain. The final decree should permanently enjoin the making of the loans, where employed or to be employed for construction of a distribution system in furtherance of the purchase of Tennessee Valley Authority power and definitely predicated on Tennessee Valley Authority as the **source of power.**