## ASHWANDER et al. v. TENNESSEE VALLEY AUTHORITY et al.

### No. 355.

District Court, N. D. Alabama, N. D. Nov. 28, 1934.

Forney Johnston (of Cabaniss & Johnston), of Birmingham, Ala., for plaintiffs.

James Lawrence Fly, Gen. Counsel, Tennessee Valley Authority, and William C. Fitts, Atty. for Tennessee Valley Authority, both of Knoxville, Tenn., for defendants.

GRUBB, District Judge.

1. The motion to dismiss criticizes the bill for prolixity, invoking Equity Rule No. 25 (28 USCA § 723); also, for multifariousness and misjoinder under Equity Rule 26 (28 USCA § 723). The motion to dismiss is not well taken on these grounds.

2. The right of the plaintiffs as preferred stockholders of the Alabama Power Company, for themselves and other preferred stockholders, to maintain the bill of complaint in the name of the corporation, is challenged. The settled rule is that stockholders cannot maintain a bill in the nature of this one, to review transactions of the corporation upon the ground that the management acted unwisely or because of mistaken business judgment. It must appear that they acted collusively or fraudulently or oppressively or beyond their powers, or under duress or with gross negligence.

There is no showing that the management of the Alabama Power Company were guilty of fraud, oppression, or gross negligence. They are shown to have acted in good faith and because they thought the transaction with the Tennessee Valley Authority was in the interest of the Alabama Power Company.

It is not shown that the management of the Alabama Power Company, in the transaction with the Tennessee Valley Authority, acted under legal duress. The claim, in this respect, is that threats of duplication of its facilities, and taking its market from the Alabama Power Company, in this way, was legal coercion, which would avail to avoid the contract at the instance of the Alabama Power Company. If the action of the Tennessee Valley Authority was legal, competition caused by it would cause no legal injury. If it was illegal, then the person aggrieved could have resorted to the courts to restrain it in advance of the infliction of the injury, just as it now asks the court to interpose after the alleged injury has been partly consummated. If the management acquiesced in the transaction, instead of resorting to the courts for protection against illegal competition or threats of it, it would not constitute legal duress.

If the Tennessee Valley Authority had no legal authority to make the contracts, which it did make with the Alabama Power Company, and the execution of the contracts was incomplete, or future performance, of them over a period provided for, the Alabama Power Company could ask for their rescission, if restitution were practicable, and if it refused to do so on request, the plaintiffs, as preferred stockholders of that company, could institute a suit in equity for that relief. In this case, possession of the property purchased from the Alabama Power Company has not yet been delivered, and the contracts remain open for continued performance in some features until December 31, 1938. If the Tennessee Valley Authority had no power to enter into the transaction evidenced by the contracts, they are subject to be set aside, either on its application or that of the government, and the consideration paid to the Alabama Power Company for the transfer recovered back by the government. The United States would not be estopped, certainly, if restitution could be made by a retransfer of the conveyed property to the seller. An ultra vires transaction is one of the classes that a stockholder can complain of, if the corporation refuses to act. The Alabama Power Company, though it was authorized to sell the property, would have standing in equity to rescind the sale, if the purchaser was not authorized to buy or the sale would accomplish an illegal object. The obligation must be mutually binding on each.

The right of the plaintiffs to succeed in their suit depends on a showing that the contracts with the Alabama Power Company were ultra vires or illegal and unexecuted, and that restitution was possible. The relief accorded to the plaintiffs, suing altogether in their capacity of preferred stockholders of the Alabama Power Company, extends no further than that the corporation be freed from the obligation of the claimed ultra vires or illegal transaction with the defendant the Tennessee Valley Authority, and with its codefendant and subsidiary, the Electric Home and Farm Authority, Inc. This

relief would include the restraining of the further execution and performance of the contracts between the Tennessee Valley Authority, the Electric Home and Farm Authority, Inc., and the Alabama Power Company. No other relief prayed for in the bill would be appropriate to plaintiffs, suing entirely in their capacity as preferred stockholders of the Alabama Power Company.

The remaining question is whether or not the Tennessee Valley Authority had the power to enter into the transaction and make the contracts with the Alabama Power Company that are complained of. The agency contract between the Electric Home and Farm Authority and the Alabama Power Company would stand or fall upon the decision of the same question.

The powers of the Tennessee Valley Authority are contained in the act of Congress creating it (Act of Congress approved May 18, 1933 [16 USCA §§ 831–831cc]).

Its caption recites its purpose to be to improve the navigability and to provide for the flood control of the Tennessee river; to provide for reforestation and the proper use of marginal lands in the Tennessee Valley; to provide for the agricultural and industrial development of said valley; to provide for the national defense, by the creation of a corporation for the operation of government properties at and near Muscle Shoals, in the state of Alabama, and for other purposes. It authorized the construction of two dams, and the taking possession by the corporation created, of the property of the government at Muscle Shoals, Ala., including Wilson Dam, and nitrate plants. Section 5 (*l*) (16 USCA § 831d (*l*) authorized it "to produce, distribute, and sell electric power, as *herein particularly specified.*" Section 10 (16 USCA § 831i) authorized its board of directors "to sell the surplus power not used in its operations, and for operation of locks and other works generated by it, to States, counties, municipalities, corporations, partnerships, or individuals, according to the policies hereinafter set forth; and to carry out said authority, the board is authorized to enter into contracts for such sale for a term not exceeding twenty years, and in the sale of such current by the board it shall give preference to States, counties, municipalities, and cooperative organizations of citizens or farmers, not organized or doing business for profit, but primarily for the purpose of supplying electricity to its own citizens or members."

The United States is a government of enumerated powers, conferred in express terms or by necessary implication on it by the Constitution. No power is conferred on it to engage in any private business, unless incidental to some power specifically granted. The power to produce, distribute, and sell electric power or any other commodity, generally, is not in terms granted, and must be connected with a granted power, in order to exist. In this case, it is sought to be connected with the power to improve navigable rivers, the power to provide for the national defense, or the power to make needful regulations concerning government owned property. The government has the right to create electric power to aid its operations, under any one or all of these granted powers. It also has the implied right to dispose of any surplus power not used for the named purposes, to prevent waste. It has no power to produce and sell electric power, except as incidental to a granted power, as in case of the disposition of such a surplus. This is especially true within the limits of a state of the United States. If the program of the Tennessee Valley Authority involves only the salvaging of excess or unused electric power, produced in aid of its operations in improving the navigation of the Tennessee river, or in relation to its operations at the Wilson Dam, or the nitrate plants, there located for the national defense, or for the benefit of lands owned by it in the government reservations, at or in the vicinity of Muscle Shoals, its right to dispose of such excess electric power cannot be questioned. This implies the existence of a surplus in its legitimate operation, and the power of disposition would be so limited. If its program is more extensive, and amounts to an engaging in and carrying on, independent of the question of surplus power and without relation to a granted power, the general business of producing and selling electric power within the limits of Alabama, it is ultra vires of the power actually conferred or that could have been conferred by Congress on the Tennessee Valley Authority by its act of incorporation.

The solution of the question depends upon the extent of its program in this respect. If a substantial relation is shown between the granted power and the surplus, it is enough. If there is no substantial relation between the granted power and the creation of the surplus electric power, the courts should declare the creation and disposition of it unauthorized. The distinction is between a salvaging of unused or excess

power created in aid of operations under a constitutional power, and so incidental and related to it, and an engaging in the production and sale of electric energy, as any other utility would do, independently of any constitutionally granted power, and unrelated to it. A corporation created by Congress would have no greater authority to do this than would the government itself. It would be the instrument of the government, and its functions restricted to what was within the power of the government.

The fact that purposes other than navigation, national defense, or regulation of proprietary property, are incidentally served, would not invalidate the exercise of the authority conferred, even if the other purposes alone would not have justified an exercise of the power. However, if the other purposes are not related to any constitutional powers or are not incidental to their exercise, they stand independently for their legality, and are not supported by them. A plan for the development of the Tennessee River Valley, as a social experiment, is in no sense related to the improvement of navigation of the Tennessee river, or to the national defense, or to the regulation of government-owned lands, and the production and sale of electrical power in aid of such development and experiment would not be incidental or related to the exercise of any of the constitutional powers named.

The scope of the project of the Tennessee Valley Authority, as outlined by its directors, and as it is being administered by it, forbids the idea that its purpose in dealing with electric power is for the salvaging of a surplus to prevent its waste. On the contrary, its disclosed purpose is to furnish an example of government operation of electric power production in the interest of public operation and ownership of such utilities, and also to furnish physical aid to a social experiment being conducted by the Authority in the Tennessee River Valley, for the improvement of the race. The official declarations of the directors can be read only with this result. They show that the project is not limited to the improvement of river navigation, to the national defense, or to the proprietary interest of the government in its own lands, but is infinitely wider in scope, being intended to create an ideal community, as a social experiment, and to give it aid by supplying cheap electric power, produced by it, for that purpose.

For the accomplishment of these aims, a sum approaching a billion dollars has been made potentially available; two additional dams are being constructed, of a type calculated to produce a maximum of electric energy, rather than that best adapted for the improvement of navigation; the construction of a third dam is announced; $100,000 has been allocated to an endeavor, by research, to discover additional uses of coal, to take the place of those displaced by the use of water power, in the production of electrical power. The declarations of the directors of the Authority, as to their purposes and expectations, and what has been and is being done in the development of electric power, are convincing that the Authority is engaged in a project, other than the improvement of navigation and for the production and disposition of electrical power, as an independent utility would do, and on a larger scale.

By sections 5 (*l*) and 10, the act confers power on the corporation to produce, distribute, and sell electric power, but only "as herein particularly specified." Section 10 restricts the power to sell, to a sale of "the surplus power not used in its operations, and for operation of locks and other works generated by it." The act authorizes the corporation to sell only surplus power in excess of or unused for its needs, for its constitutional function.

Even if the act of Congress itself does not infringe the Constitution, if the management of the Authority is mistakenly construing and administering the act, by engaging under color of, but in excess of its terms, in an enterprise which is not authorized by the act, and which the Congress would not be authorized to enact, such administrative action should be enjoined as ultra vires of the corporation. As the contracts of January 4, 1934, February 13, 1934, and August 9, 1934, were steps taken to carry out the ultra vires enterprise of the Authority in engaging as a public utility in the production and sale of electric power, within the limits of the state of Alabama, not in aid of the exercise of any constitutional power, they were taken without authority, and the completion of the contracts and their performance should be restrained, and the contracting parties restored to their former status, as far as may be possible.

The plaintiffs, suing solely as preferred stockholders of the Alabama Power Company, should be accorded only the relief that it would be entitled to, if it were the plaintiff, i. e., to have the ultra vires transaction set aside, the contracts canceled, and their future performance enjoined. The exercise of the right of the Authority to produce elec-

tric power for use in its operations, in the improvement of navigation, or any other constitutional power, and to sell any legitimate surplus power so created, should not be interfered with. The transaction and contracts between the Authority and the Alabama Power Company have no relation to such production of electric power, or to the disposal of such a surplus. They are in aid of the broader project, viz., to furnish a yardstick in the interest of consumers of electric power, and help the development of the Tennessee River Valley, as a social experiment, by selling cheap electric power.

Under our dual system of government, the United States, in the exercise of its constitutional powers, even within the confines of one of the states, has paramount power over the state. In matters of internal concern not affecting any constitutional power of the national government, the state, under the reservation contained in the Tenth Amendment, has exclusive authority. If the Tennessee Valley Authority, within this state, is engaging in a proprietary adventure, unrelated to any power conferred upon it or on its principal by the Constitution, then it is doing an unauthorized thing. Engaging in the business of producing and selling electric power, as a utility, it would become subject to state regulation, and likely be in competition with private utilities, or with the state or its municipalities, while so engaged. It is contrary to the genius of our dual government, that the national government should do business, in a proprietary capacity, of an internal nature, and not related to a constitutional power, within the limits of a state, and occupy extensive areas of territory therein for that purpose. It would be fraught with possibilities of collision between such governments and individuals. The Tennessee Valley Authority, if the averments of the bill are sustained, is engaged in producing and selling electric power in Alabama, in an enterprise having no substantial relation to the improvements of navigation or any constitutional power, on an elaborate scale, building dams designed for maximum electric power production to increase surplus power; fixing rates and terms in displacement of state functions, with the declared purpose to increase the magnitude of the enterprise in the future. This is not a plan involving only the disposing of surplus electric power necessarily created in the improvement of navigation of the Tennessee river.

The motion to dismiss the bill of complaint is overruled, and the defendant is allowed twenty days in which to answer.