**Alexander ROGERS, on Behalf of Himself and All Other Stockholders of Metal & Thermit Corporation, Appellee,**

v.

**AMERICAN CAN COMPANY, a Corporation, Charles J. Beasley, Robert G. Fuller, H. E. Martin, Cornelius W. Middleton, William P. Palmer, Walton S. Smith, William C. Stolk, Russell C. Taylor and Metal & Thermit Corporation, a Corporation, American Can Company, Metal & Thermit Corporation, Charles J. Beasley and Walton S. Smith, Appellants.**

Nos. 13493–13495.

United States Court of Appeals Third Circuit.

Argued May 2, 1961.

Decided June 15, 1962.

As Amended June 26, 1962.

---

1. See Theriot v. Mercer, 5 Cir. 1959, 262 F.2d 754.

Emory C. Risley, Newark, N. J. (Stryker, Tams & Horner, Newark, on the brief), for Metal & Thermit Corp.

Alfred C. Clapp, Newark, N. J. (Clapp & Eisenberg, Newark, N. J., Robert P. Gorman, John B. M. Frohling, Newark, N. J., on the brief), for Beasley and Smith.

Donald B. Kipp, Newark, N. J. (Pitney, Hardin & Ward, Newark, N. J., William P. Reiss, Newark, N. J., Clyde A. Szuch, Maplewood, N. J., on the brief), for American Can Co.

Charles J. Milton, Jersey City, N. J., for appellee.

Before GOODRICH, STALEY and FORMAN, Circuit Judges.

FORMAN, *Circuit Judge.*

This is a stockholder's derivative action brought by Alexander Rogers, as plaintiff in the United States District Court for the District of New Jersey for himself and other similarly situated stockholders of Metal & Thermit Corporation (M & T), a New Jersey corporation, on behalf of that corporation against American Can Company (Canco), likewise a New Jersey corporation, eight individuals,[1] Charles J. Beasley, Robert G. Fuller, H. E. Martin, Cornelius W. Middleton, William P. Palmer, Walton S. Smith, William C. Stolk and Russell C. Taylor, who, with four others, constituted the Board of Directors of M & T, and M & T itself.

The suit was instituted under §§ 4 and 16 of the Clayton Act, 15 U.S.C.A. §§ 15 and 26, for violations of §§ 1 and 2 of the Sherman Act and §§ 7 and 8 of the Clayton Act, 15 U.S.C.A. §§ 1, 2, 18 and 19.[2]

---

1. Service of process in this suit was made on only two individuals, Charles J. Beasley and Walton S. Smith.

2. This suit is the reinstitution of a similar action which was dismissed by the District Court without prejudice for failure to

It came before the District Court on motions addressed to the amended complaint, which alleges, among other things, the following: that plaintiff holds 4200 shares of the common stock of M & T; that Canco and the individual defendants above named have effective control of M & T "by virtue of their stock ownership, control of proxy material, and control of the management and operations of Metal & Thermit Corporation, and they have, in effect, caused a merger of these two corporations."; that in February 1957 the Board of Directors of M & T were unable to agree upon the selection of candidates for a board of twelve directors to be presented at the annual stockholders' meeting held in April 1957; that Canco and the individual defendants organized a proxy contest committee and commenced the solicitation of proxies; that thereafter plaintiff organized a proxy contest committee, which resulted in the election of eight of the nominees on the Canco slate and four nominees on the slate of the plaintiff's committee; that Canco financed the campaign of its slate while plaintiff helped to finance the campaign of his slate; that a similar contest ensued for the election of directors at the annual meeting of M & T on April 10, 1958; that at the request of the plaintiff the following proposed statement was included in the management proxy statement:

"RESOLVED: That the stockholders of Metal & Thermit Corporation, hereby demand that the Board of Directors take necessary steps to institute an action against the Amer-

ican Can Company and its principal officers and directors, and against certain of the directors of Metal & Thermit Corporation, namely, H. E. Martin, Charles J. Beasley, Robert G. Fuller, Cornelius W. Middleton, William P. Palmer, Walton S. Smith, William C. Stolk and Russell C. Taylor, for the actions of the American Can Company and its agents and the above-named directors of Metal & Thermit Corporation which are in violation of the anti-trust laws of the United States, more particularly the Sherman Act, Sections 1 and 2; the Clayton Act, Sections 7 and 8, and the Corporation Law of the State of New Jersey [N.J.S.A. 14:1–1 et seq.], and seek to restrain the continuance of such violations, and for the recovery of damages for the benefit of Metal & Thermit Corporation, as the Court may find just and proper.

" * * * Statement * * *

"Last year, American Can Company financed a proxy fight to elect a Metal & Thermit Corporation Board which would retain H. E. Martin in office as President of your Company. Mr. Martin negotiates your Company's contracts with American Can Company for the purchase of tin plate scrap, which are not submitted to your Board of Directors for Approval. Therefore, American Can Company is in a position to control the prices paid for tinplate scrap. In the opinion of

comply with Federal Rule of Civil Procedure 23(b), 28 U.S.C.A., which is as follows:

"(b) Secondary Action by Shareholders. In an action brought to enforce a secondary right on the part of one or more shareholders in an association, incorporated or unincorporated, because the association refuses to enforce rights which may properly be asserted by it, the complaint shall be verified by oath and shall aver (1) that the plaintiff was a shareholder at the time of the transaction of which he complains or that his share thereafter devolved

on him by operation of law and (2) that the action is not a collusive one to confer on a court of the United States jurisdiction of any action of which it would not otherwise have jurisdiction. The complaint shall also set forth with particularity the efforts of the plaintiff to secure from the managing directors or trustees and, if necessary, from the shareholders such action as he desires, and the reasons for his failure to obtain such action or the reasons for not making such effort."

Counsel for Mr. Rogers, this is in violation of the Antitrust Laws."; that the said resolution and statement were also circulated to the stockholders as part of the proxy form and ballot by the plaintiff's proxy contest committee; that at the 1958 meeting 579,945 shares voted against the proposal and 185,731 shares voted for the proposal; that the stockholders also reelected the eight individual defendants as directors.

The amended complaint further alleges that M & T is the largest producer of tin chemicals in the United States and makes 50 percent of all the detinned scrap and tin derived from the detinning of tinplate scrap; that it has plants in Carteret, New Jersey; East Chicago, Indiana; Piscatawaytown, New Jersey; South San Francisco, California; Beaver Dam, Hanover County, Virginia; Carrollton, Kentucky; and research laboratories in Rahway, New Jersey, and Detroit, Michigan; that it was organized in 1908 and as of December 31, 1957 had total assets of over $24,000,000 and gross sales of over $42,000,000; that the sale of products resulting from the detinning of tinplate scrap accounted for approximately 40 percent of the total gross sales and approximately 66 percent of the total net profits of M & T for the year 1957; that the principal supplier of tinplate scrap to M & T is Canco in the amount of approximately 150,000 tons of tinplate annually, having an approximate value of $7,000,000; that most purchases of tinplate scrap by M & T are made on a contract basis in the following market areas in the United States and Canada: The Eastern Market (Philadelphia); The Mid-Western Market (East Chicago); and West Coast Market (San Francisco) and Canada.

The amended complaint also alleges that:

"The purchase contracts entered into with contract suppliers of tinplate scrap by Metal & Thermit Corporation provide for a fixed differential to be paid to Metal & Thermit Corporation, which differential covers the cost of detinning and the profit to be realized by Metal & Thermit Corporation for its services, subject to adjustment for freight charges which are a material part of these contracts. The said differential is premised upon a price for detinned scrap and tin which is referred to as the market price. In the event that the average for the month of tinplate scrap and tin fluctuates, Metal & Thermit Corporation is required to pay an additional amount as the price increases and is entitled to a credit in the event that the price decreases. Therefore, in a rising market, Metal & Thermit Corporation is required to pay to the supplier of tinplate scrap the additional amount realized over and above the base price of purchased tinplate scrap and tin as specified in the contract.";

that the only competition presently existing for the purchase of tinplate scrap is among M & T, Vulcan Materials Company, and a few local processors in the eastern and mid-western markets; that M & T and its subsidiary and affiliated companies purchased tinplate scrap for detinning purposes in the following approximate percentages of all purchases of tinplate scrap in the several geographical areas during the year 1957:

"Eastern Market Area
(Philadelphia) ............ 40%
Mid-Western Market Area
(East Chicago) ............ 54%
West Coast Market Area
(San Francisco) ........... 100%
Total of United States
Market Areas .............. 50%";

and that in view of Canco's fiduciary relationship, as a dominant stockholder of M & T, Canco cannot enter the detinning business and utilize the process of M & T unless it merges with M & T.

It is further alleged that Canco acquired a portion of the common stock of M & T at the time of its organization in 1908 and that M & T operated as an independent company with representa-

tives of Canco serving as directors until 1954 when the defendant H. E. Martin was elected President of M & T; that beginning in 1955 the defendants have been and are engaged in a continuing combination, conspiracy and agreement to lessen competition substantially and monopolize interstate trade and commerce in the purchase and sale of tinplate scrap, the substantial terms of which are:

"a. The American Can Company would acquire the common stock of Metal & Thermit Corporation and thereafter operate the Metal & Thermit Corporation either as a wholly owned subsidiary of the American Can Company or as a division of the American Can Company.

"b. The American Can Company with and through the individual defendants would seek to control and does control the Board of Directors of Metal & Thermit Corporation.

"c. The individual defendants would, as directors and/or officers of Metal & Thermit Corporation, insure to the American Can Company its further entrenchment as the principal supplier of tinplate scrap to Metal & Thermit Corporation.

"d. The American Can Company and the individual defendants would use and do use Metal & Thermit Corporation and its major position in the several market areas to fix the price of tinplate scrap in the several market areas in the United States.

" * * * By virtue of the aforesaid concert of action and its execution by all of the defendants, there has been brought about in essence, a merger of Metal & Thermit Corporation into the American Can Company for the benefit of the American Can Company in contravention of the antitrust laws."

The amended complaint further alleges that the combination and conspiracy were effectuated by means and methods including the following: that in June 1956 defendants William C. Stolk and Russell C. Taylor, and James A. Stewart, respectively, President and Vice Presidents of Canco, met with plaintiff and others, at which time William C. Stolk stated that Canco wished to merge with M & T for the purpose of having Canco enter the detinning business; that he and the codefendants last named threatened that if the offer were refused Canco would discontinue to supply M & T with tinplate scrap and would enter the detinning business itself; that Canco and the individual defendants, pursuant to the conspiracy to gain control of the Board of Directors of M & T, organized a proxy contest committee and solicited proxies to be used in electing directors at the annual meeting of stockholders of M & T held on April 11, 1957, which committee was financed by Canco at a cost of approximately $50,000; that the defendant William P. Palmer was retained as counsel for the proxy contest committee and his firm was designated as counsel for M & T; that the same law firm is also counsel for Canco; that having gained control of the Board of Directors of M & T in April 1957, the individual defendants, acting as a majority of the board, proceeded forthwith to replace as officers of M & T, and as members of the Executive Committee, those individuals who were opposed to the objectives of the conspiracy with persons sympathetic to Canco's illegal purposes; that William C. Stolk was President and a director of Canco; Russell C. Taylor was Vice President and director in charge of manufacturing of Canco, and they together with Charles J. Beasley, Robert G. Fuller, H. E. Martin, Cornelius W. Middleton, William P. Palmer and Walton S. Smith, were candidates for the directory of M & T on the management proxy committee slate financed by Canco in 1957, as well as candidates on the management proxy committee slate in 1958 and their primary loyalty to Canco caused conflict of interests which prevented them from acting as independent directors of M & T.

The amended complaint further charged that the contracts entered into by Canco and M & T for the sale of tinplate scrap are employed to effectuate an agreement that M & T would pay no higher price for tinplate scrap to any other container manufacturer who sought to sell tinplate scrap on a term contract basis; that the periodic contract made with Canco is first negotiated and all other purchase contracts follow the price pattern set in the contract with Canco "and the ultimate amount received by Metal & Thermit Company is controlled accordingly"; and that these contracts have not been submitted to the Board of Directors of M & T.

It is also charged in the amended complaint that Canco and the individual defendants in the course of soliciting proxies for the annual meetings of 1957 and 1958 intimidated the stockholders of M & T by threatening to cause the withdrawal of Canco from supplying substantial amounts of tinplate scrap to M & T.[3]

The amended complaint further states that M & T has been greatly damaged because of the alleged violations of law and has continued to be damaged in the following ways: the effective control of M & T exercised by Canco and the individual defendants has overborne its corporate will and deprived it of its freedom of decision, in effect causing the merger of the two corporations and has caused M & T to participate in the violations of the antitrust laws; that M & T by reason of such control is prevented from developing and expanding into fields most beneficial to it and that it is required to act primarily for the benefit of Canco; that the relationship existing between Canco and M & T prevents M & T from actively competing in the open market for the purchase of tinplate scrap; that Canco and the individual defendants have entrenched Canco as the primary supplier of tinplate scrap to M & T, thereby putting Canco in a position to fix the price that M & T can pay for tinplate scrap; that the conflict of interests of the individual defendants, who owe primary loyalty to Canco, prevents them from acting as independent directors of M & T to the great detriment of M & T; that the public is deprived of the benefits of free competition by the combination and conspiracy in the following ways: that the contract relationship and effective control by Canco over M & T enables Canco to fix the price of tinplate scrap in the aforementioned geographical areas and to foreclose competitors from competing in those market areas; that the sale of tinplate scrap by tin container manufacturers substantially affects the profit or loss resulting from their operations and that the controlling position of Canco allows it to lessen competition substantially in the purchase and sale of tinplate scrap and in the production and sale of tin containers; that Canco's ownership of common stock and its control of M & T and effective merger of it has a tendency to create a monopoly in the sale and production of detinned scrap through the monopoly of tinplate scrap and that the control by Canco of M & T can be used to injure other container manufacturers by depriving them of the means of disposing of their tinplate scrap and of a significant source of income therefrom on a fixed contractual basis.

It is further alleged that M & T is joined in the amended complaint as a defendant only because it is in the effective control of the other defendants and is, therefore, unable to express its independent judgment to join as a plaintiff in this action.

The relief prayed for in the amended complaint is for judgment for the benefit of M & T against Canco and the eight

3. A preliminary hearing was held by the District Court on the question of intimidation. Plaintiff was ordered to produce evidence in support of such allegations. He failed to submit clear evidence and admitted his inability to support such allegation which was thereupon excluded from consideration on the defendants' motions for dismissal. Rogers v. American Can Co., 187 F.Supp. 532, 534–535 (D.N.J. 1960).

individual defendants declaring that they have violated and have caused M & T to violate the antitrust laws and directing defendants to desist from continuing said violations; for treble damages in the amount of $5,000,000 plus counsel fees and costs; for an injunction directing Canco to divest itself of its stock interest in M & T or in the alternative, an injunction directing Canco to hold its stock in M & T as an "investment" within the meaning of § 7 of the Clayton Act and for other injunctive relief.

The amended complaint contains an affidavit by plaintiff in which he swears that the statements contained therein are true to the best of his knowledge and belief.

The amended complaint was attacked by three motions for dismissal and for entry of summary judgment pursuant to Rules 15 and 56 of the Federal Rules of Civil Procedure; one by Canco, another by the two served defendant directors of M & T, Charles J. Beasley and Walton S. Smith and the third by M & T.

The District Court filed an opinion in which it held that the motions of the defendants should be denied.[4] In entering its order to that effect, pursuant to 28 U.S.C. § 1292(b), it certified that a controlling question of law was involved as to which there is substantial ground for different opinion and that an immediate appeal from the order might materially advance the ultimate termination of the litigation. This court granted permission to appeal from the interlocutory order.

Briefs were filed by M & T, by Charles J. Beasley and Walton S. Smith, the two directors of M & T who were served with the complaint and by Canco. Each of the three briefs presents arguments attacking the position of the plaintiff from a somewhat different point of view. In the main, however, they consist of interlocking contentions and will be generally treated herein as if a single brief and argument had been made for all of the defendants.

In the 1958 election, 766,276 shares of stock, constituting 96 percent of those eligible were voted.[5] Nine directors named on the slate of the management of M & T were elected and three on the slate of plaintiff's proxy committee.[6] The resolution proposed by plaintiff for the institution of litigation was defeated. It received 185,731 in its favor, while 579,-945 voted against it.

The issue raised by the appeal is a narrow one, i. e., whether the District Court erred in holding that the plaintiff had standing to maintain this action in the face of the adverse vote of an independent majority of the stockholders of M & T.

We may therefore come immediately to that question. The defendants submit that federal and state decisions firmly support their contentions that they are entitled to summary judgment because there are no genuine issues of material facts bearing upon plaintiff's lack of standing to maintain this suit in the face of the stockholders' disapproval.

They say that the resolution of this question of law turns, among others, upon the following decisions of the Supreme Court: Hawes v. Oakland, 104 U.S. 450, 26 L.Ed. 827 (1882); Corbus v. Alaska Treadwell Gold Mining Co., 187 U.S. 455, 23 S.Ct. 157, 47 L.Ed. 256

---

4. The opinion of the District Court is reported in 187 F.Supp. 532.

5. Of the 766,276 shares which were voted, proxies for 406,650 were held by management of M & T proxies for 186,929 shares were held by plaintiff's proxy committee and 172,697 shares held by Canco were represented by special agents in person.

   At the time of the 1958 election, plaintiff, his family and associates owned or controlled 20.3 percent of the stock of M & T as against 22.3 percent held by Canco and the individual defendants.

6. The nine directors consisted of the eight individual defendants and Garfield L. Miller, Jr. The plaintiff, Leslie C. Rogers and John F. Condon were the three candidates on the plaintiff's proxy committee slate who were elected.

(1903); United Copper Securities Co. v. Amalgamated Copper Co., 244 U.S. 261, 37 S.Ct. 509, 61 L.Ed. 1119 (1917) and Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct 466, 80 L.Ed. 688 (1936).

In Hawes v. Oakland, supra, the complainant, a citizen of New York, and a stockholder in a California water works company, brought a bill in equity in the Circuit Court of the District of California against the City of Oakland, the water company and its directors, alleging that the company was furnishing water to the City of Oakland free of charge beyond what it was required to do by law and that the company and the complainant thereby suffered great loss and damage. The City of Oakland filed a demurrer which was sustained by the trial court and the bill was dismissed.

On appeal the Supreme Court held that the complainant in such a suit must show some action or threatened action of the directors or trustees which is beyond the authority conferred by the charter, or the law under which the company was organized; or such a fraudulent action, completed or threatened, by them, either among themselves or with some other party, or with shareholders, as will result in serious injury to the company or the other shareholders; or that the directors or a majority of them, are acting for their own interests, in a manner destructive of the company, or of the rights of other shareholders; or that the majority of shareholders are oppressively and illegally pursuing a course in violation of the rights of the other shareholders which can only be restrained by a court of equity.

Such a complaining shareholder was further required to show that he had exhausted all means of obtaining redress of his grievances within the corporation by making an effort to induce the directors of the corporation to take remedial action and if he failed with the directors and time permitted that he had applied to the stockholders as a body to take action or show why it was not reasonable for him to attempt such persuasion.

The Court added that there should also be "[a]n allegation that complainant was a shareholder at the time of the transactions of which he complains, or that his shares have devolved on him since by operation of law, and that the suit was not a collusive one to confer on a court of the United States jurisdiction in a case of which it could otherwise have no cognizance [and the bill] should be verified by affidavit." 104 U.S. at 461.

The bill having presented no such case the Court affirmed its dismissal on the ground that the complainant had no standing in a court of equity and no right in himself to prosecute the suit.[7]

A number of significant factors distinguish the present case from Hawes. It was based on diversity while this is founded on federal statutes. In Hawes the action on which the complaint was based, namely the furnishing of free water to the city was neither illegal nor ultra vires. The complaint here charges acts that are violative of federal law. They fall within at least two of the requirements laid down by the Court as requisite to the maintenance of a derivative suit inasmuch as they constitute "such a fraudulent transaction complete or threatened by them [the defendant

---

7. Equity Rule 94 (104 U.S. ix) was adopted immediately after the Supreme Court decided the Hawes case (104 U.S. 450, 26 L.Ed. 827, 1882). It was modified slightly in 1912 when Equity Rule 27 was promulgated. These attempts to regulate the resolution of derivative shareholders' suits in federal courts culminated in present Federal Rule of Civil Procedure 23(b). The decision in the Hawes case and the promulgation of Rule 94 and its succes-

sors were designed to limit the jurisdiction of federal courts to bona fide cases of diversity and to inhibit the threatened increase in volume of suits collusively seeking the jurisdiction of the courts of the United States since the decision in Dodge v. Woolsey, 18 How. 331, 59 U.S. 331, 15 L.Ed. 401 (1856). See 3 Moore, Federal Practice, § 23.15, at 3489-3493 (2 ed. 1948).

directors of M & T] either among themselves or with some other party [Canco] or with shareholders as will result in serious injury to the company or the stockholders" and "that the directors or a majority of them are acting for their own interests in a manner destructive of the company * * *."

Also, the plaintiff in Hawes showed no proof that he had exhausted his remedies within the corporation or that the application for such would have been futile. In this case the plaintiff has exhausted such remedies.

In Corbus v. Alaska Treadwell Gold Mining Co., supra, a stockholder brought a derivative action against his corporation for an injunction to restrain it from paying an Alaskan license tax. The Court affirmed the action of the trial court sustaining a demurrer filed by the United States Attorney for Alaska. It recited at length the language of Hawes v. Oakland, supra, as to the necessary foundations of a stockholder's derivative suit.

It also referred to its recent adoption of Equity Rule 94 [8] and emphasized that a mere technical compliance therewith would not be sufficient to preclude an inquiry as to the right of the stockholder to maintain a bill against his corporation, asserting that it would examine the bill in its entirety to determine whether under all of the circumstances a showing of wrong on the part of the corporation or its officers has been made.

The defendants stress the breadth of discretion which the Court accorded to the directors of corporations in making their decisions which it held are to be presumed to be honest, according to their best judgment and in the interest of all of the stockholders. The defendants point particularly to the following language of the Court:

"* * * The directors may sometimes properly waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right. They may regard the expense of enforcing the right or the furtherance of the general business of the corporation in determining whether to waive or insist upon the right. And a court of equity may not be called upon at the appeal of any single stockholder to compel the directors or the corporation to enforce every right which it may possess irrespective of other considerations. * * *" 187 U.S. at p. 463, 23 S.Ct. at p. 160.

The dismissal of the complaint hinged on the failure of the plaintiff to exhaust his intracorporate remedies as required in Hawes and on the general law that complainant was not entitled to enjoin the collection of a tax even though allegedly illegal. The circumstances underlying Corbus are far different from the present case.

In United Copper Securities Co. v. Amalgamated Copper Co., supra, the corporate plaintiff and Arthur P. Heinze, shareholders in United Copper Company, filed an action at law in the United States District Court for the Southern District of New York alleging that the defendants other than United Copper Company had injured it by conduct violating the Sherman Act; that plaintiffs before instituting the action had demanded that United Copper Company commence this or a like suit, which its Board

---

**8.** Rule 94 provides as follows:

"Every bill brought by one or more stockholders in a corporation, against the corporation and other parties, founded on rights which may properly be asserted by the corporation, must be verified by oath, and must contain an allegation that the plaintiff was a shareholder at the time of the transaction of which he complains, or that his share had devolved on him since by operation of law; and that the suit is not a collusive one to confer on a court of the United States jurisdiction of a case of which it would not otherwise have cognizance. It must also set forth with particularity the efforts of the plaintiff to secure such action as he desires on the part of the managing directors or trustees, and, if necessary, of the shareholders, and the causes of his failure to obtain such action."

of Directors had refused to do; that the plaintiffs brought their action for themselves and also on behalf of all other stockholders of the United Copper Company. The plaintiffs demanded judgment in their favor and for any stockholders who might join them for treble damages and that "each of the defendants shall be compelled to pay the damages sustained by the United Copper Company * * *."

The District Court sustained a demurrer filed by the defendants and dismissed the complaint. The Court of Appeals for the Second Circuit affirmed. 223 F. 421 (1915).

On review the Supreme Court observed that the complaint failed to assert that the alleged wrongful acts injured the plaintiffs as individual shareholders and that no recovery was sought for damages to them or to their property. It stated:

"* * * The case involves, therefore, this single question: Whether a stockholder in a corporation which is alleged to have a cause of action in damages against others for conduct in violation of the Sherman Act, may sue at law to recover such damages in the right of the corporation, if, after request, it refuses to institute the suit itself? Insuperable obstacles to the maintenance of the action are presented both by the substantive law and by the law of procedure.

"Whether or not a corporation shall seek to enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management and is left to the discretion of the directors, in the absence of instruction by vote of the stockholders. Courts interfere seldom to control such discretion *intra vires* the corporation, except where the directors are guilty of misconduct equivalent to a breach of trust, or where they stand in a dual relation which prevents an unprejudiced exercise of judgment; and, as a rule, only after

application to the stockholders, unless it appears that there was no opportunity for such application, that such application would be futile (as where the wrongdoers control the corporation), or that the delay involved would defeat recovery. In the instant case there is no allegation that the United Copper Company is in the control of the alleged wrongdoers or that its directors stand in any relations to them or that they have been guilty of any misconduct whatsoever. Nor is there even an allegation that their action in refusing to bring such suit is unwise. No application appears to have been made to the stockholders as a body or indeed to any other stockholders individually; nor does it appear that there was no opportunity to make it, and no special facts are shown which render such application unnecessary. For aught that appears, the course pursued by the directors has the approval of all the stockholders except the plaintiffs. The fact that the cause of action is based on the Sherman Law does not limit the discretion of the directors or the power of the body of stockholders; nor does it give to individual shareholders the right to interfere with the internal management of the corporation.

"But even if the circumstances were such as to justify individual stockholders in seeking the aid of the court to enforce the rights of the corporation, it is clear that their remedy is not at law. The particular equitable relief sought in Fleitmann v. Welsbach [Street Lighting] Co., 240 U.S. 27 [36 S.Ct. 233, 60 L.Ed. 505], was denied; but this denial affords no reason for assuming that the long settled rule under which stockholders may seek such relief only in a court of equity will be departed from because the cause of action involved arises under the Sherman Law." (Footnotes omit-

ted.) 244 U.S. at 263–265, 37 S.Ct. at 510–511.

The judgment of dismissal was affirmed.

In United Copper the derivative suit was indeed bottomed on an alleged violation of the antitrust laws, as in this suit, but it was directed toward defendants other than the directors of United Copper, and did not charge it or them with any ultra vires or illegal act. In holding that under ordinary circumstances it is left to the discretion of the directors to declare whether a corporation shall seek to enforce a cause of action for damages, the Court pointedly mentioned exceptions to the general rule such as "where the directors are guilty of misconduct equivalent to a breach of trust, or where they stand in a dual relation which prevents an unprejudiced exercise of judgment." It found that there was no "allegation that the United Copper Company is in the control of the alleged wrongdoers or that its directors stand in any relations to them or that they have been guilty of any misconduct whatsoever." In marked distinction, the allegations in the present amended complaint charge that the defendant directors of M & T, constituting a majority of the board, influenced by the dual relation of some of them to Canco, are acting in a conspiracy with Canco to draw M & T into violation of the antitrust laws to its damage. The Court was also critical of the fact that in United Copper no application had been made to stockholders or facts asserted which would excuse the lack of such an appeal. The charges made in the amended complaint here place this suit in circumstances which are specifically excluded from the decision in United Copper.

There remains the Court's objection to the suit on the procedural ground that the remedy of a stockholder seeking to enforce rights of his corporation was clearly an equitable action and not one enforceable at law. The District Court in this case properly determined that the inhibitions that prompted the Court in United Copper to hold that procedural-

ly the suit could not be maintained, have been overcome under the broad concept of Federal Rule of Civil Procedure 2 on the authority of Fanchon & Marco, Inc. v. Paramount Pictures, 202 F.2d 731, 36 A.L.R.2d 1336 (2 Cir.1953). In that case the District Court for the Southern District of New York ruled that "a stockholder's derivative suit does not lie for the recovery of treble damages under the antitrust laws because the claim is one at law," citing Fleitmann v. Welsbach Street Lighting Co., 240 U.S. 27, 36 S.Ct. 233, 60 L.Ed. 505 (1916) and United Copper Securities Co. v. Amalgamated Copper Co., supra. The Court of Appeals reversed, concluding:

"* * * So the antitrust derivative action is quite thoroughly recognized as a proper suit in equity in those cases which have questioned its availability at law, since the shareholder's right to sue in the corporate stead must be first established. See United Copper Securities Co. v. Amalgamated Copper Co., supra; Decorative Stone Co. v. Building Trades Council of Westchester County, 2 Cir., 23 F.2d 426, certiorari denied 277 U.S. 594, 48 S.Ct. 530, 72 L.Ed. 1005; Meyer v. Kansas City Southern Ry. Co., 2 Cir., 84 F.2d 411, certiorari denied 299 U.S. 607, 57 S.Ct. 233, 81 L.Ed. 488. And see also Kavanaugh v. Commonwealth Trust Co., 181 N.Y. 121, 73 N.E. 562; Glenn, The Stockholder's Suit, 33 Yale L.J. 580, 582. * * *

* * * * * *

"* * * The two major issues of right of the shareholder to sue and of violation of the antitrust laws causing damage to the corporation can be tried side by side or otherwise as may be convenient; that one may go to the jury while the other does not causes no difficulty. United States v. Yellow Cab Co., 340 U.S. 543, 555, 556, 71 S.Ct. 399, 95 L.Ed. 523; Bruckman v. Hollzer, 9 Cir., 152 F.2d 730; Ring v. Spina, supra [2 Cir., 148 F.2d 647, 160 A.L.R. 371]. The Fleitmann case of course

requires that if treble damages are to be assessed, they must be on a verdict by a jury unless that has been waived by both parties, as provided in F.R. 38, 39. There is nothing in the Fleitmann case to hold more; and we do not believe sound policy consistent with greater restriction on the right to treble damages. See 52 Col.L.Rev. 1069, 1071; 61 Yale L.J. 1010, 1020, 1021, 1055, 1062. In fact Justice Holmes left open the case of a bill in equity for 'a decree directing the corporation to sue, or, if it fails to do so, permitting the plaintiff to sue in its name and on its behalf,' 240 U.S. at page 29, 36 S.Ct. 233, 234, 60 L.Ed. 505, which in substance is what this procedure amounts to under the wider scope of action now permissible. See also the discussion by Justice Brandeis of the effect of a lack of showing of mismanagement or improper refusal to sue by the directors in United Copper Securities Co. v. Amalgamated Copper Co., supra  *  *  *." 202 F.2d at 734–735.

See Kogan v. Schenley Industries, 20 F.R.D. 4 (D.Del.1956). Cf. Ramsburg v. American Investment Co., 231 F.2d 333 (7 Cir.1956); Dairy Queen v. Wood, 82 S.Ct. 894 (1962).

In Ashwander v. Tennessee Valley Authority, supra, minority owners of preferred stock of Alabama Power Company with voting rights brought a derivative suit to invalidate a contract between the company and the Tennessee Valley Authority for the sale and exchange of electric power and the acquisition of certain transmission lines. Also, certain activities of the Authority were sought to be restrained as unconstitutional. The District Court decided that the contract should be set aside.[9] The Court of Appeals for the Fifth Circuit reversed the District Court.[10] Its decision was affirmed.

The Supreme Court was divided on the question of whether preferred stockholders who had sought unsuccessfully to have rights of their corporation asserted by it, had standing to bring a derivative action. In the controlling opinion the Court ruled that such stockholders were entitled to maintain a derivative action.

However, the defendants press the views of Justice Brandeis who, while concurring in the disposition of the constitutional question, was of the opinion that the Court of Appeals should have been affirmed without reaching it. His language was:

" *  *  * The fact that the bill calls for an enquiry into the legality of the transaction does not overcome the obstacle that ordinarily stockholders have no standing to interfere with the management. Mere belief that corporate action, taken or contemplated, is illegal gives the stockholder no greater right to interfere than is possessed by any other citizen. Stockholders are not guardians of the public. The function of guarding the public against acts deemed illegal rests with the public officials.

"Within recognized limits, stockholders may invoke the judicial remedy to enjoin acts of the management which threaten their property interests. But they cannot secure the aid of a court to correct what appears to them to be a mistake of judgment on the part of the officers. Courts may not interfere with the management of the corporation, unless there is bad faith, disregard of relative rights of its members, or other action seriously threatening their property rights. This rule applies whether the mistake is due to error of fact or of law, or merely to bad business judgment. It applies, among other things, where the

---

9. Ashwander v. Tennessee Valley Authority, 8 F.Supp. 893 (N.D.Ala.1934); 9 F.Supp. 800 (N.D.Ala.1935); 9 F.Supp. 965 (N.D.Ala.1935).

10. Tennessee Valley Authority v. Ashwander, 78 F.2d 578 (5 Cir. 1935).

mistake alleged is the refusal to assert a seemingly clear cause of action, or the compromise of it. United Copper Securities Co. v. Amalgamated Copper Co., 244 U.S. 261, 263–264 [37 S.Ct. 509, 61 L.Ed. 1119]. If a stockholder could compel the officers to enforce every legal right, courts, instead of chosen officers, would be the arbiters of the corporation's fate." 297 U.S. at 343, 56 S.Ct. at 481.

The defendants contend that the rationale of Hawes and United Copper is further elucidated by the foregoing statement. But its effect is not found to broaden the determination of the Court in United Copper. The elements of control of the corporation in the hands of the alleged wrongdoers or that its directors stand in any relationship to them, said to be exceptions to the bar against derivative stockholder action in United Copper remains as potent as before. Ashwander adds no further element of bar to this action.

The defendants also claim support in the following lower federal court cases: Kessler v. Ensley Co., 123 F. 546 (Cir. Ct.Ala.1903), 129 F. 397 (Cir.Ct.Ala. 1904); Post v. Buck's Stove & Range Co., 200 F. 918, 43 L.R.A.,N.S., 498 (8 Cir.1912); and Meyer v. Kansas City S Ry. Co., 84 F.2d 411 (2 Cir.1936).

Kessler v. Ensley, supra, was an equity action based on diversity of citizenship in which minority stockholders sought relief against the refusal of directors and a majority of stockholders to institute suit to set aside conveyances of land of the company and for other relief. The plaintiffs charged that a majority of former directors had formed another company and had contrived to gain title to the land in violation of their fiduciary duties.

The court gave consideration to the bill of complaint twice. In the first instance it sustained demurrers to the bill

based on the plaintiffs' lack of standing because of the adverse votes of the directors and a majority of stockholders. However, leave was given by the court to amend the bill.

An amended bill was filed which was again attacked by special demurrers. Upon the occasion of its second consideration of the case, reported in 129 F. 397, the court reiterated its observation in the earlier decision that "the minority was bound by the action of the governing body, which was not charged to be interested, or acting from improper motive." At page 399. This time the court sustained special demurrers to so much of the bill as sought to vacate certain conveyances and overruled other demurrers leaving issues of laches, fraud and breaches of duties to final hearing.[11]

In its first decision the court found that the sales of which the plaintiffs complained were not ultra vires the corporation and were not forbidden by statute. The grievances related to transactions wholly intra vires and the corporate decision was held to put an end to the right of a dissenting stockholder to rescind the transaction.

The circumstances of the present case are far different in that complaint is made of acts which are ultra vires the corporation and are public wrongs, a distinction which is specifically recognized in the first Kessler opinion. (123 F. at 561)

Meyer v. Kansas City S. Ry. Co., supra, was a derivative action in which plaintiff was a minority stockholder in St. Louis Southwestern Rwy. Company. He instituted suit in its behalf against other railroads, their directors, the directors of Southwestern Railway Company, certain banking houses and others for conspiracy to control St. Louis Southwestern Railway Company to its great damage. The complaint prayed for an accounting of defendants' liability to plaintiff's company of their profits in dealing in the

---

11. On final hearing the bill was dismissed for laches. Kessler & Co. v. Ensley Co., 141 F. 130 (N.D.Ala.1905), aff'd 148 F. 1019 (5 Cir. 1906), cert. denied 205 U.S. 541, 27 S.Ct. 788, 51 L.Ed. 921 (1907).

stocks of the railroads concerned; the appointment of a receiver and injunctive relief against the continuation of the conspiracy. The District Court for the Southern District of New York dismissed the complaint for want of subject matter jurisdicion. Although the plaintiff disclaimed any purpose to recover damages for violations of the antitrust laws he argued that the federal court had jurisdiction under the then § 24 of the Judicial Code, 28 U.S.C.A. § 41 (now 28 U.S.C.A. § 1331) because the damaging acts of the defendants were not only violative of fiduciary duties but were also violations of the antitrust laws and that in determining their liabilities the court must construe or interpret the federal statutes. The court rejected the argument that the suit was cognizable either under then § 41 or as a diversity action. It held that the defendants' liability would be complete under the complaint though their acts were not public offenses and a determination of federal law was not necessarily involved. The judgment of the District Court that it lacked subject matter jurisdiction was affirmed.

The defendants contend that the present case, too, actually involves an intracorporate dispute based upon alleged breaches of fiduciary duty owed by directors or officers, which the court may not entertain for diversity is not alleged here. They further submit that the suit by a minority stockholder may not be converted, in effect, into a treble damage antitrust action by virtue of charges that fiduciary duties have been breached. They assert that jurisdiction can only attach on a claim by M & T against the other defendants because of alleged violations of the antitrust laws which have caused or threaten injury or damage to M & T.

Meyer v. Kansas City S. Ry. Co. differs from this suit in that it was specifically disclaimed in the former that damages were sought under the antitrust laws. Rather the complaint sought the appointment of a receiver with a directive to bring a treble damage antitrust action against the defendants. The allegation that federal statutes would require construction and interpretation was obviously for the purpose of providing federal court jurisdiction. Here no diversity jurisdiction is claimed and the plaintiff seeks relief and recovery of treble damages for the corporation under the antitrust laws.

In Post v. Buck's Stove & Range Co., supra, the allegations bear little resemblance to the charges here. There the directors of the stove company had yielded a claim against a labor union under the Sherman Act as part of a settlement of litigation against it. Minority stockholders objected and brought suit against the union and others for treble damages under the antitrust laws. Its dismissal on demurrer was affirmed on the ground that the directors were charged with no breach of faith or act contrary to law and that the corporation possessed wide discretion in determining business policies and methods of executing them, which a stockholder could not control or have revised by appeal to the courts.

In addition to the federal court precedents cited by defendants they claim that their position is supported by decisions of state courts. They urge as notably in their favor, Solomont & Sons Trust, Inc. v. New England Theatres Operating Corp., 326 Mass. 99, 93 N.E.2d 241 (Sup. Jud.Ct.1950) in which plaintiffs brought an action as minority stockholders against their corporation, its directors and outside parties to enforce certain corporate claims on which the corporation and the majority of the stockholders had refused to bring suit. The "wrongs" alleged included improper purchase and discount of a note of the corporation, similar purchases of another note, implementation of a plan to gain control of the corporation, settlement of certain antitrust suits and "unconscionable and excessive compensation" under management contracts which were said also to be in violation of the federal antitrust laws.

The Massachusetts Supreme Court found the issue to be:

"* * * [W]hether a minority of the stockholders, however small, have a legal right to insist that suit shall be brought by a corporation against its officers or directors whenever a charge is made against them, even though a majority of the stockholders, undominated and uncontrolled, acting reasonably and in good faith, deem it not to be consonant with the best interest of the corporation that such suit be brought. * * *" 326 Mass. at 111–112, 93 N.E.2d at 247.

Holding in the negative, the court could perceive

"* * * no reason why the usual rule recognizing that it is for the corporation to decide questions of business policy should be subject to an exception limiting the corporate power where a charge is made against an officer or director but where an independent, disinterested majority of the stockholders acting reasonably and in good faith have voted that in their judgment it is not in the best interest of the corporation to sue. * * *" 326 Mass. at 114, 93 N.E.2d at 249.

Decisions of other state courts view the situation differently. The chiefly quoted example is Continental Securities Co. v. Belmont, 206 N.Y. 7, 99 N.E. 138, 51 L.R.A.,N.S., 112 (1912), a stockholders' derivative suit based on a complaint alleging that directors had fraudulently issued stock. A motion to dismiss was made on the ground, among other reasons, that the plaintiffs had failed to allege that they had given notice of the alleged fraud to the body of the stockholders and had demanded of them that some action should be taken to redress the wrong, and that the stockholders had refused to take any action relating there-

to. The court held that it was not necessary to place the matter before the stockholders,[12] stating:

"* * * [I]t is generally recognized that certain acts of boards of directors that are legal, but voidable, can be ratified and confirmed by a majority of the body of stockholders as the ultimate parties in interest and thus make them binding upon the corporation. Morawetz on Corporations (2d Ed.) §§ 625, 626. Such recognized authority in stockholders to ratify and confirm the acts of boards of directors is confined to acts voidable by reason of irregularities in the make-up of the board or otherwise, or by reason of the directors or some of them being personally interested in the subject-matter of the contract or act, or for some other similar reason which makes the action of the directors voidable. No such authority exists in case of an act of the board of directors which is prohibited by law or which is against public policy. * * *" 206 N.Y. at 17–18, 99 N.E. at 142.

Defendants concede that Continental Securities represents a philosophy opposed to that expressed in Solomont. They submit that the New Jersey Supreme Court expressly declined to follow it in Escoett v. Aldecress Country Club, 16 N.J. 438, 446, 109 A.2d 277 (1954), where a member in an incorporated country club filed a derivative suit alleging that a defendant trustee of the club had mulcted the club through the payment of excess salaries, through making substantial improvements to realty owned by the defendant trustee's company and leased to the club and other "wrongs". The plaintiff claimed that he had been denied a membership list by the management of the club but that he had communicated with members whom he knew who in-

12. The court relied in part on the authority of the English case of Foss v. Harbottle, 2 Hare 461, reference to which is also made in Hawes v. Oakland, 104 U.S. 450, 454, 26 L.Ed. 827. The court in

Continental Securities Co. v. Belmont, 206 N.Y. 7, 99 N.E. 138, 51 L.R.A.,N.S., 112 (1912) specifically declared that its decision was not in conflict with Hawes v. Oakland.

formed him that they were afraid to co-operate with him lest they lose their memberships for which they had paid in advance.

The Chancery Division of the New Jersey Superior Court dismissed the complaint on defendants' motion on the ground that it failed to allege that plaintiff sought the aid of the membership body.

The New Jersey Supreme Court, having certified the plaintiff's appeal, referred to its adoption of procedural rules in 1948 including Rule 4:36–2 which is identical with Rule 23(b) of the Federal Rules of Civil Procedure. It observed that most of the federal cases have given wide sweep to the rule and have required application to the general body of stockholders even in situations, where non-ratifiable fraudulent actions have been involved. The court, referring to Rule 4:36–2, held: ·

" * * * Here for the first time in our State appeared the additional requirement for application to the general body of stockholders; it is clear that in its adoption the court contemplated that ordinarily a stockholder would be required to seek or excuse relief not only from directors but also from the general body of stockholders before he instituted a derivative action. And we do not read into the rule any blanket exemption in situations where the wrongs complained of are not subject to formal ratification by the stockholders; even there the stockholder may, before instituting his action, be profitably expected to call upon the general body of stockholders for support which may be in the form of internal corporate action or in joinder in his court action. As the terms of the rule itself indicate, the requirement of application to the general body of stockholders is not

absolute and will readily give way in the interests of justice. Cf. Waldor v. Untermann, 10 N.J.Super. 188, 191, 76 A.2d 906 (App.Div.1950). Thus, resort to the general body of stockholders would be unnecessary where it would jeopardize the cause of action or where it affirmatively appeared to be futile or impracticable or otherwise unwarranted. Much will depend on the particular circumstances in each case and the rule must be applied practically and flexibly to the end that while corporations and their officials are to receive reasonable measures of protection against strike suits, they are not to be substantially immunized from accounting to their stockholders for mismanagement." 16 N.J. at 449–450, 109 A.2d at 283.

Accordingly in Escoett the court reversed the Chancery Division of the Superior Court on the ground that plaintiff had shown that it would be impracticable to apply for redress to the membership body and so was excused therefrom as a condition to bringing his derivative suit.

On the other hand in Mayer v. Adams, 141 A.2d 458 (1958) the Supreme Court of Delaware held that notwithstanding its Rule 23(b) of the Rules of the Court of Chancery, Del.C.Ann.[13] relating to stockholders' derivative suits a cause of action for fraud allegedly committed by directors may be maintained by a minority stockholder without demand upon the body of the stockholders. The court said:

"We hold that if a minority stockholders' complaint is based upon an alleged wrong committed by the directors against the corporation, of such a nature as to be beyond ratification by a majority of the stockholders, it is not necessary to allege or prove an effort to obtain action by

13. The second sentence of paragraph (b) provides:
"The complaint shall also set forth with particularity the efforts of the plaintiff to secure from the managing directors or

trustees and, if necessary, from the shareholders such action as he desires, and the reasons for his failure to obtain such action or the reasons for not making such effort."

the stockholders to redress the wrong." 141 A.2d at 465.

The court differed with the view held in Escoett that anything substantial could be accomplished by a demand upon stockholders in a case in which fraud is charged. It opined that such a demand would be a futile gesture.

In New Jersey, the former Court of Errors and Appeals, in the case of Siegman v. Electric Vehicle Co., 72 N.J.Eq. 403, 65 A. 910 (1907) [14] dealt with an action by a stockholder against his corporation and a former director thereof alleging that the latter had voted to declare dividends out of capital contrary to the provisions of Section 30 of the New Jersey General Corporation Act of 1896.

A plea was interposed by the defendants in which the facts of the complaint were not denied, but it was alleged that the claim of illegality in the declaration of dividends was without substance; that the dividends were reasonably made in the light of what was known and believed at the time they were declared, fairly and in good faith, and that it was not for the interests of the company that suit should be brought until such suit should be ordered by a majority in interest of the stockholders other than the former directors.

The plea further set up that afterwards on request of complainant the directors called a meeting of the stockholders and the question of whether or not a suit should be brought was submitted to them; that the stock of the former directors was excluded from voting with the result that 124,759 shares were against bringing the suit, while 650 shares voted in favor of it.

The court held that the approval of the unlawful dividends by a majority of the stockholders did not validate the declaration of dividends out of capital and no conclusive efficacy could be accorded to the resolution of the stockholders approving the action of the then present directors in declining to sue for restitution. The court concluded:

"Conceding that with respect to matters that are by law confided to the judgment of the board of directors, their determination with respect to the commencement of an action may, under ordinary circumstances, be binding upon a dissenting stockholder; and that with respect to matters *ultra vires*, the directors but *intra vires* the corporation, the approval by a majority of the stockholders of the action of the directors may in some cases amount to a ratification; yet in our opinion, neither a board of directors nor a majority of stockholders can by ratification make valid that which the corporation itself is by law prohibited from doing; nor can such ratification be accomplished indirectly under the guise of a refusal to bring an action." 72 N.J.Eq. at 409, 65 A. at 912.

The court cited many authorities including Hawes v. Oakland, supra, and Corbus v. Alaska Treadwell Gold Mining Co., supra, and said:

" * * * The effect of these authorities is that courts will not in ordinary circumstances interfere with the internal management of corporations acting within their powers; but without exception the same authorities recognize either

14. Section 30 of the New Jersey General Corporation Act of 1896, Laws 1896, c. 185, provided as follows:

"No corporation shall make dividends, except from the surplus or net profits arising from its business, nor divide, withdraw, or in any way pay to the stockholders, or any of them, any part of its capital stock, or reduce its capital stock, except according to this act, and in case of any violation of the provisions of this section, the directors under whose administration the same may happen shall be jointly and severally liable, at any time within six years after paying such dividend, to the corporation and to its creditors, in the event of its dissolution or insolvency, to the full amount of the dividend made or capital stock so divided, withdrawn, paid out or reduced, with interest on the same from the time such liability accrued; * * *."

expressly or by necessary implication, that this rule has no application to transactions that are *ultra vires* the company or prohibited by positive law." 72 N.J.Eq. at 410, 65 A. at 913.

The order of the Court of Chancery overruling the plea and requiring the defendant to answer the bill was affirmed.

Of course there are differences between Siegman and the case at bar. However, in declining to permit action by a majority of the stockholders to bar a derivative suit where the alleged "wrongs" were ultra vires the corporation or prohibited by positive law the case maintained a significant principle not inconsistent with federal jurisprudence.

In Gottesman v. General Motors Corporation, 268 F.2d 194 (2 Cir.1959), an action had been instituted by stockholders of General Motors Corporation in its behalf against it and E. I. du Pont de Nemours and Company for treble damages against du Pont for violation of the antitrust laws, in reliance on the decision of the Supreme Court of the United States in United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957).

The defendants moved to dismiss the complaint on the ground, among others, that its allegations were insufficient to excuse the failure of the plaintiffs to make demand on the stockholders of General Motors to bring the suit as is required by Rule 23(b) of the Federal Rules of Civil Procedure.

The complaint [15] contained allegations explaining the failure of the plaintiffs to make an effort to secure from the stockholders the action they sought. It was charged therein that the stock of General Motors (other than du Pont's 23 percent of all outstanding common stock) was held by hundreds of thousands of other stockholders in all parts of the world, none of whom owned as much as 10 percent and that in 1957 out of approximately 667,000 stockholders other than du

Pont, approximately 500,000 owned no more than 200 shares each and 159,000 owned no more than 25 shares each; that du Pont's stock permitted it to exercise a dominant control and that demands on the stockholders of General Motors would have been futile because if the majority of the stockholders had demanded that suit be instituted the request would not have been honored by General Motor's Board of Directors and that the practical effect of such a demand would have been to involve plaintiffs in a proxy contest from which it would have been impossible for them to emerge successfully.

The District Court held that the motion was ruled by Delaware & Hudson Co. v. Albany & Susquehanna Railroad Co., 213 U.S. 435, 29 S.Ct. 540, 53 L.Ed. 862 (1909) and that the reasons alleged by the plaintiff for not making the effort to obtain action from the stockholders were adequate.

However, recognizing that the decision enabled a relatively small stockholders' interest to plunge two large corporations into inevitably long and expensive litigation which, if the determination of the motion were erroneous, could result in the waste of time and money of all parties the District Court granted a certificate of substantial question under 28 U.S.C. § 1292(b).

A majority of the Court of Appeals for the Second Circuit declined to allow the appeal, holding that there was no substantial ground for a "difference of opinion" as to the District Court's refusal to require plaintiffs to make a demand on the stockholders of General Motors. In clarification of its holding, the court went on to comment:

" * * * A shareholders' vote cannot prevent the institution of a derivative suit or annul one once it has been brought; had that been possible it is obvious that very few such suits could or would have been maintained. At best a ratification by the body of shareholders merely

15. As recited in the opinion of the District Court, Gottesman v. General Motors Corporation, 171 F.Supp. 661, 663 (S.D.N.Y. 1959).

compels the minority shareholder plaintiffs to shift slightly the legal theories on which they rely so as to raise charges of fraud, waste of corporate assets, or the like. See Continental Securities Co. v. Belmont, supra, 206 N.Y. 7, 18–20, 99 N.E. 138, 51 L.R.A.,N.S., 112; Pollitz v. Wabash R. Co., 207 N.Y. 113, 100 N.E. 721; Steinberg v. Hardy, supra, D.C.Conn., 90 F.Supp. 167; 2 Fletcher, Cyclopedia of Corporations § 764 (1931); 13 id. § 5795. In the instant case even this slight effect on the litigation cannot occur, since the wrongful acts alleged—violations of the antitrust laws by Du Pont—can in no way be ratified or rectified by a vote of the shareholders of General Motors. Cf. City of Chicago v. Mills, 204 U.S. 321, 328–330, 27 S.Ct. 286, 51 L.Ed. 504." 268 F.2d at 197.

The defendants are critical of this statement in the majority opinion and its application here. They contend that the reference to the possible effect of a stockholders' vote is contrary to the principles of established federal jurisprudence and that the court erroneously followed state court decisions. They submit that it is significant that United Copper was not mentioned in the opinion.

Obviously Gottesman is different from the present case both on the facts and the immediate issues of law. However, the challenged statement is not vulnerable to defendants' attacks, particularly when it is read with the decision of the same court in Fanchon & Marco, Inc. v. Paramount Pictures, supra, wherein United Copper was discussed and treated fully by the same judges who constituted the majority in each case.[16] It is enough to say that the conclusions in Gottesman that the vote of the shareholders may not bar a derivative suit under the circumstances there and that the alleged violations of the antitrust acts were insusceptible of ratification or rectification have equal application here.

The argument made by defendants that the legislative history [17] bearing on amendments to the Clayton Act demonstrates that provisions were rejected which proposed to give federal courts jurisdiction of suits by a stockholder to redress intracorporate grievances claimed to violate the antitrust laws is not persuasive in the light of the allegations of this complaint.

The defendants have reviewed in detail the various communications made to the stockholders of M & T by its management and by the plaintiff during the proxy contests of 1957 and 1958. They contend that these, the testimony of the plaintiff himself and the allegations of the amended complaint, demonstrate that his dispute is based upon disagreements with H. E. Martin, the President of M & T, and with policies formulated and carried out by him with the approval of the defendant directors. The defendants say that this suit is merely another effort on his part to oust Martin and the directors who supported him.

It is the contention of the defendants that the issues raised by the material presented to the stockholders posed to them an exercise of their business judgment as to whether or not to sue and that their rejection of the proposal was an expression of their preference to have the management continue under the presidency of H. E. Martin and the members of the Board of Directors they had elected rather than under the guidance of the plaintiff.

They submit that the District Court erred in failing to recognize that the litigation presented to the stockholders by the plaintiff constituted only an intracorporate dispute concerning the management of M & T, and that the business character of the stockholders' decision not to sue was a bar to the bringing of

16. Judge Clark wrote the opinion in both cases with Judge Swan concurring in each. Dissenting opinions were expressed by Judge Chase in Fanchon and Judge Moore in Gottesman.

17. Vol. 51, Part 16, Congressional Record 63 Congress, Second Session, pp. 15789, 16048–16118, 16170.

plaintiff's action. We cannot agree, for, as has been seen, the amended complaint contains allegations which far transcend a mere intracorporate controversy and charge the defendants with specific violations of the antitrust laws. It is true that much of the material that went to the stockholders during the proxy contest and in the plaintiff's deposition, consisted of his criticism and disapproval of corporate policies and management of the business of M & T. However, this is not the only basis of plaintiff's suit. He has pleaded in his amended complaint specific allegations of antitrust law vio-. lations by the defendants. If those charges were not spelled out to the stockholders in detail as the defendants assert at least sufficient notice of them was presented in the proposed resolution and statement circulated by both proxy committees. The material in the communications, the deposition of the plaintiff and the allegations of his amended complaint are not of a character that should have compelled the District Court, as defendants urge, to grant them summary judgment of the dismissal of the amended complaint. Nor is the argument of the defendants impressive that disinterested stockholders are under no greater obligation to sue under the antitrust laws than for any other wrong, it being solely their judgment that determines whether it is in the best interest of the corporation to sue in either case.

The defendants claim that the fault in the judgment of the District Court

"* * * rests upon a series of major and minor subsidiary misconceptions: that, where a statute affords the opportunity for a private law suit to be instituted, there is somehow an obligation upon a person or a corporation to bring one; that a determination not to sue is somehow a ratification of action that may be illegal, with some juridical consequences of exoneration; that majority stockholder action pursuant to Rule 23(b) is meaningful or futile depending upon the identity of the defendant; and that the controlling rules laid down by the Supreme Court in Hawes v. Oakland and United Copper should be disregarded."

Of these alleged misconceptions it is said that the basic one was that the refusal to institute a private law suit could "ratify, condone or exonerate any violations of the Sherman Act." But, in its opinion, the District Court said:

"* * * However, in and of itself a negative disinterested shareholder vote should not be a bar to the continuation of the derivative suit under all circumstances. And this is especially so where the action is based solely on Federal antitrust law, which is here allegedly violated by the defendants. These laws express an important nationwide public policy. Obviously it is unlawful to violate them. It would seem equally obvious that it would be legally impossible to ratify their violation. Further, it would be equally unlawful to conspire and agree to violate them in the future. Nor could such an agreement be lawfully ratified. * * * Thus any attempt by corporate stockholders by vote or otherwise, to ratify such illegal acts in the past, or to conspire to that end in the future, would be a nullity, calling for the intervention of equity to prevent the effectuation of such conspiracy in the future, and entitling the corporation to damages for its injuries in the past.

"So much for the effect of a stockholder vote to ratify the acts of third parties in violation of the antitrust laws which injure the corporation. Since the vote is a nullity, obviously it cannot bar a suit by the injured corporation, or a derivative suit by a minority stockholder, to obtain relief." 187 F.Supp. at 537.

The District Court then discussed the question of "whether a stockholder vote not to sue is an exercise of business judgment or an *attempt* to ratify an allegedly illegal act." (Emphasis supplied.)

It concluded that:

"\* \* \* [A] careful consideration of the complaint herein leads to no other conclusion than that the vote of the shareholders was an *attempt* at ratification of the alleged wrong. \* \* \*

\* \* \* \* \* \*

"\* \* \* It was a vote that the stockholders not only approved of the allegedly illegal acts of their own directors with Canco, but that the stockholders wanted these same methods to be continued in the future by these reelected director defendants.

"Since the shareholder vote is equivalent to an *attempted* ratification of these alleged antitrust violations, and was not purely an expression of business judgment, the vote will not serve as a bar to the bringing of the present suit. Siegman, supra; Gottesman, supra; Continental Securities Co. v. Belmont, supra. It would be unthinkable to allow the ratification of violations of Federal law to serve as a bar to a suit for redress of the injuries sustained thereby where Congress by specific enactments has provided for such redress as a matter of public policy." (Emphasis supplied.) 187 F.Supp. at 539–540.

The District Court did not rest its decision that the negative majority vote was ineffective as a bar because the determination not to sue constituted a ratification. It distinctly found that there could be no ratification here. It called the negative vote of the stockholders an "attempted ratification." Whether or not the term "attempted ratification" is accurately applied to the action taken by the stockholders is not of importance. It could not be a *ratification* of the alleged acts of Canco and the defendant directors and no more so could it be an exercise of business judgment that would bar the bringing of the derivative suits since the amended complaint implicated the directors of M & T of conspiracy with Canco to violate the antitrust laws to the damage of M & T.

The vote of the majority of stockholders, disinterested though they may be, not to sue, may not deprive plaintiff of his standing to bring this action. The business judgment character of the stockholders' determination, generally effective to definitively terminate intracorporate controversies, must yield to the right of a minority stockholder to expose his charges of violations of positive law which he alleges his corporation is itself prevented from bringing by reason of its captivity through the conspiratorial activities of its directors and a substantial stockholder and chief supplier. In this respect he is not usurping the role of the Attorney General as the public prosecutor of infractions of the antitrust laws, as suggested by defendants, but rather is engaged in achieving for his corporation the relief and recovery which the Clayton Act empowers it to seek, were it free to do so, thereby at the same time supporting the effectiveness of the enforcement of the antitrust laws, a purpose for which the treble damage suit was designed as an instrumentality. See Lawlor v. National Screen Service Corp., 349 U.S. 322, 329, 75 S.Ct. 865, 99 L.Ed. 1122 (1954).

If the majority vote of the stockholders against suit is not a bar, the defendants ask of what utility is the requirement that the intracorporate remedies must be exhausted, as called for by the provisions of Rule 23(b) of the Federal Rules of Civil Procedure. The presuit requirements have their uses, as suggested by the District Court when it said:

"\* \* \* There can be many reasons for requiring a stockholder vote. Perhaps the stockholder will be able to effect a satisfactory intracorporate settlement. Perhaps they can persuade the directors to bring the action. Perhaps they will take over the action themselves. Finally, they can, of course, as they did here, reject the idea entirely. Obviously go-

ing first to the stockholders has many practical advantages." 187 F. Supp. at 537.[18]

For the purpose of these motions the allegations of the amended complaint are to be taken as true. They define conduct upon the part of the defendants that bring them within the very exceptions provided in the cases said by defendants to control this one. The essence of the violation of §§ 1 and 2 of the Sherman Act and §§ 7 and 8 of the Clayton Act, charged in the amended complaint is that Canco and the defendant directors of M & T, under the influence of the other defendants, constituted a conspiracy to monopolize and restrain interstate trade and commerce in the purchase and sale of tinplate scrap and to lessen competition substantially by having Canco acquire the common stock of M & T and thereafter operate it either as a wholly owned subsidiary or as a division of Canco; by controlling the Board of Directors of M & T through the defendant directors named in the amended complaint; by the action of the defendants and Canco to insure the "further entrenchment" of Canco as the principal supplier of tinplate scrap to M & T; and by using M & T and its major position in the market to fix the price of tinplate scrap across the United States. Specific methods and means for effectuating the conspiracy, which is alleged to be a continuing one, are described. M & T is alleged to be greatly damaged by the restraints imposed upon it by the defendants in creating practically a merger of M & T into the structure of Canco and that thereby M & T has lost its freedom to actually compete for tinplate scrap in the market in which it operates.

Plaintiff's allegations concerning the activities of the defendants are tantamount to charges that M & T is a victim of violations of the antitrust laws through the alleged misconduct, equivalent to a breach of trust of its directors, defendants herein, in conspiracy with Canco. Concededly, breaches of fiduciary duties are charged here in the sweep of allegations upon which the violations of the antitrust laws are based; but it is not pretended in this suit that jurisdiction stands on diversity. It is strictly a suit for relief and recovery on behalf of M & T under the Clayton and Sherman Acts.

The argument of defendants that the determination of a majority of the stockholders not to sue is a bar to a derivative suit by a minority stockholder, is not without some basis in reason. To hold otherwise not only permits the plaintiff to precipitate the defendants into litigation which will involve them in the heavy expenditure of both time and money but may open the door to many suits wherein parties will endeavor to air their intracorporate controversies under the guise of treble damage antitrust actions. However, these considerations cannot overcome the necessity to provide each plaintiff with the opportunity to press a just claim if he has one. Moreover the plaintiff is not without his obligations. He must sustain the burden of proving his charges within the confines of the federal grounds he has alleged. But with the use of modern techniques the trial court will exercise its supervision over the cause in an endeavor to economize as far as possible on the expenditure of costs to the parties and of time to them and the court. How far the plaintiff can carry his burden remains to be seen, but this is not the stage at which he should be restrained from going forward.

The impetus to litigants to intrude unwarranted suits into the courts, as depicted by the defendants, is a hazard that is not new, and must likewise be met with appropriate means to curb them if and when such unwholesome practices develop. On the other hand, short cuts may not be taken at the expense of frustrating justice. As was

18. See Escoett v. Aldecress Country Club, 16 N.J. 438, 446–447, 109 A.2d 277 (1954) and cases there cited.

said in Escoett v. Aldecress Country Club, supra:

"  *   *   * If, as may well be, the asserted wrongdoings have no foundation whatever, the defendants will have expeditious opportunity after the plaintiff has fairly had his day in court, to obtain complete vindication and relief by judgment of dismissal resting on the absence of merit rather than upon procedural deficiency.   *   *   *"   16 N.J. at 451, 109 A.2d at 284.

The judgment of the District Court denying the motions of the defendants for summary judgments and for dismissal of the amended complaint will be affirmed.